```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION


 4
     FESKE, ET AL,                 )  CV-11-4124-PSG
 5                                 )
                   PLAINTIFF,      )  SAN JOSE, CALIFORNIA
 6                                 )
            VS.                    )
 7                                 )  MAY 29, 2012
     MHC THOUSAND TRAILS           )
 8   LIMITED PARTNERSHIP, ET       )
     AL,                           )  PAGES 1-37
 9                                 )
                   DEFENDANT.
10   _____

11              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE PAUL S. GREWAL
12            UNITED STATES DISTRICT JUDGE

13

14   A P P E A R A N C E S:

15

16   FOR THE PLAINTIFF:   SHENKMAN & HUGHES
                          BY:  KEVIN SHENKMAN
17                        28905 WIGHT ROAD
                          MALIBU, CA 90265
18

19

20   FOR THE DEFENDANT:   JENNER & BLOCK, LLP
                          BY:  DAVID BRADFORD
21                        633 W. 5TH STREET, STE 3500
                          LOS ANGELES, CA 90071
22

23

24

25   OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
                          CERTIFICATE NUMBER 13185
```

```
1    SAN JOSE, CALIFORNIA            MAY 29, 2012
2                P R O C E E D I N G S
3             (WHEREUPON, COURT CONVENED AND THE
4    FOLLOWING PROCEEDINGS WERE HELD:)
5             THE CLERK:  CALLING DAVID, FESKE, ET AL
6    VERSUS MHC THOUSAND TRAILS LIMITED.
7             CASE CV-11-4124.  MATTER ON FOR
8    DEFENDANT'S MOTION FOR PROTECTIVE ORDER,
9    DEFENDANT'S MOTION TO RESOLVE SAMPLING ISSUES AND
10   PLAINTIFF'S MOTION FOR CLARIFICATION.
11            COUNSEL, PLEASE COME FORWARD AND STATE
12   YOUR APPEARANCES.
13            MR. BRADFORD:  GOOD MORNING, YOUR HONOR.
14            DAVID BRADFORD ON BEHALF OF THE
15   DEFENDANTS.
16            THE COURT:  MR. BRADFORD, WELCOME.
17            GOOD MORNING, SIR.
18            MR. SHENKMAN:  GOOD MORNING, YOUR HONOR.
19            KEVIN SHENKMAN ON BEHALF OF THE
20   PLAINTIFFS.
21            THE COURT:  GOOD MORNING TO YOU, SIR.
22            ALL RIGHT, COUNSEL, I HAVE THREE MOTIONS
23   ALTHOUGH I THINK TWO OF THEM ARE FAIRLY UNDERSTOOD
24   AS FLIP SIDES, IF I CAN USE THAT TERM, OF THE SAME
25   ISSUE.
```

1          I WOULD LIKE TO BEGIN WITH THE SAMPLING

2     ISSUE.  AND I WILL START WITH THE PLAINTIFFS,

3     ALTHOUGH OF COURSE I WILL GIVE THE DEFENDANTS A

4     FULL OPPORTUNITY ALSO.

5          SO YOU MAY BE SEATED.  AND I WILL TURN

6     THINGS OVER TO YOU, COUNSEL.

7          MR. SHENKMAN:  THANK YOU, YOUR HONOR.

8          WHEN YOUR HONOR ISSUED THE ORDER ON

9     APRIL 3RD, WE UNDERSTOOD THAT WHAT THIS COURT MEANT

10    WAS TO PROVIDE A REASONABLE NUMBER LESS THAN A

11    105,000 THE TOTAL PUTATIVE CLASS SIZE THAT WOULD

12    ALLOW SUFFICIENT DISCOVERY, ALLOW SUFFICIENT

13    INVESTIGATION OF THE COMMONALITY OF THE MERITS OF

14    THE CASE, AND WHAT WE GOT BACK FROM THE DEFENDANTS

15    IS FRANKLY FURTHER DELAY.

16         YOU KNOW, THE PROPOSAL THAT THEY STARTED

17    WITH A 156, THEY ENDED UP WITH SOMETHING LIKE 60.

18    AND IT JUST DOESN'T PASS THE STRAIGHT FACE TEST TO

19    THINK THAT A SAMPLE OF 60 PEOPLE COULD REPRESENT A

20    105,000 STATISTICALLY OR OTHERWISE.

21         AND THAT'S NOT EVEN TAKING INTO

22    CONSIDERATION THE FACT THAT NOT ALL OF THOSE 60

23    PEOPLE ARE GOING TO RESPOND.  IN FACT, BASED ON MY

24    OWN EXPERIENCE, BASED ON THE EXPERIENCE OF MY

25    CO-COUNSEL AND DR. KROSNICK WHO SUBMITTED A REPORT

1    IN THIS MATTER, IF YOU GET SOMETHING LIKE

2    20 PERCENT RESPONSE RATE, YOU ARE DOING GREAT.

3            SO WHEN YOU TAKE THAT INTO CONSIDERATION,

4    WE ARE TALKING ABOUT 12 OR 15 PEOPLE AS A SAMPLE

5    SIZE TO REPRESENT A 105,000.

6            THAT DOESN'T MAKE ANY SENSE.

7            THE COURT:  SO LET'S TAKE THESE ISSUES

8    ONE AT A TIME, AND BEAR WITH ME, YOU ALL KNOW THESE

9    ISSUES FAR BETTER THAN I DO.

10           BUT AT LEAST OVER THE WEEKEND AND THIS

11   MORNING AS I WAS REVIEWING YOUR PAPERS, A COUPLE OF

12   ISSUES CAME TO MIND THAT I WANT TO JUST DISCUSS

13   WITH EACH OF YOU.

14           THE FIRST IS IT SEEMS TO ME, THE QUESTION

15   OF WHAT IT MEANS TO BE STATISTICALLY SIGNIFICANT

16   SAMPLE, AND I RECOGNIZE THOSE ARE MY WORDS, NOT

17   YOURS, SO I'M ASKING FOR HELP HERE AND NOT CASTING

18   ASPERSIONS.

19           I CHOSE THAT LIMITATION PRETTY CAREFULLY.

20   AND THE REASON I CHOSE IT AND USED IT WAS IT

21   STRIKES ME THAT IN A CASE OF THIS NATURE, SOME TYPE

22   OF BOUNDARY IS APPROPRIATE.

23           AND I THINK IN EACH CASE THE BOUNDARY MAY

24   VARY DEPENDING ON THE NATURE OF THE POPULATION

25   THAT'S AT ISSUE AND THE ISSUES THAT ARE IN DISPUTE.

```
 1          WHAT I'M FIRST INTERESTED IN LEARNING

 2   FROM YOU IS DO YOUR EXPERTS OFFER ANY PARTICULAR

 3   THOUGHT ABOUT WHAT A STATISTICALLY SIGNIFICANT

 4   SAMPLE MIGHT LOOK LIKE HERE TO ACHIEVE THE

 5   OBJECTIVE OF SHEDDING LIGHT ON WHETHER A CLASS

 6   OUGHT TO BE CERTIFIED AND WHETHER THE UNDERLYING

 7   FACTORS, FOR EXAMPLE, ARE MET.

 8          MR. SHENKMAN:  WELL, I THINK STATISTICAL

 9   SIGNIFICANCE, ANYTHING COULD BE STATISTICALLY

10   SIGNIFICANT.  IT'S A QUESTION OF HOW STATISTICALLY

11   SIGNIFICANT.  FIVE PEOPLE COULD BE STATISTICALLY

12   SIGNIFICANT.

13          THE COURT:  RIGHT.  THE MARGIN OF ERROR

14   COULD BE FIVE.

15          MR. SHENKMAN:  EXACTLY.

16          SO WHAT I TRIED TO PROVIDE THE COURT IN

17   OUR PAPERS IS A TABLE SHOWING IF YOU USE THIS

18   MARGIN OF ERROR AND THIS LEVEL OF CONFIDENCE, THIS

19   IS THE NUMBER THAT WOULD BE REQUIRED, THIS IS THE

20   NUMBER OF RESPONSES THAT WOULD BE REQUIRED.

21          AND WE ALSO CITED CASE LAW TALKING ABOUT

22   WHAT AN APPROPRIATE ERROR OF MARGIN IS.  AND THE

23   DEFENDANT'S PROPOSED 10 PERCENT WE PROVIDED CASE

24   LAW SHOWING 10 PERCENT IS NOT APPROPRIATE.  THE

25   CASE LAW SAYS ANYTHING UNDER THREE PERCENT IS OKAY.
```

1    ANYTHING OVER 5 PERCENT IS DEFINITELY NOT.

2              SO IN THAT SENSE IF WE DO USE

3    STATISTICALLY SIGNIFICANT, IF WE USE THAT PHRASE OR

4    THAT STANDARD IN TERMS OF STATISTICAL SCIENCE, FOR

5    LACK OF A BETTER WAY OF SAYING IT, AND TAKING INTO

6    ACCOUNT THE RESPONSE RATE, YOU ARE STILL TALKING

7    ABOUT THOUSANDS OF PEOPLE, NOT 60.

8              SO IT WOULD SEEM TO ME --

9              THE COURT:  THAT COURTS WRESTLE WITH THIS

10   ISSUE IN ALL SORTS OF OTHER CONTEXT.

11             AND ORDINARILY THE WAY ONE RESOLVES THE

12   QUESTION OF WHAT STATISTICAL SIGNIFICANCE IS

13   SIGNIFICANT ENOUGH IS TO LOOK TO WHAT PEOPLE IN

14   THIS FIELD RELY UPON IN MAKING DECISIONS, EITHER

15   FOR PURPOSES OF ECONOMIC RESEARCH OR FOR BUSINESS

16   DECISIONS, IF WE ARE TALKING ABOUT A DEFENDANT IN A

17   TYPICAL CASE.

18             SO IS THERE ANY GUIDANCE YOU ALL CAN

19   PROVIDE TO ME THAT WOULD ALLOW ME TO LOOK AT WHAT

20   PEOPLE IN THE REAL WORLD RELY UPON IN MAKING SOME

21   OF THESE DECISIONS?

22             MR. SHENKMAN:  YOUR HONOR, STANDING HERE

23   TODAY I CAN ONLY REALLY RELY ON ANECDOTAL,

24   POLITICAL POLLING FOR EXAMPLE --

25             THE COURT:  I'M GLAD YOU BROUGHT UP THAT

1    EXAMPLE BECAUSE I HAVE TO SAY WHEN I OPEN UP THE

2    SUNDAY PAPER AND I READ THE LATEST POLLS IN THIS

3    ELECTION OR ANOTHER, I'M STRUCK THAT IN MANY CASES

4    DECISIONS INVOLVING MILLIONS OF DOLLARS OR HUGE

5    STAKES OF OTHER TYPES ARE MADE ON THE BASIS OF

6    POLLING THAT INVOLVES A SAMPLE SIZE OF 3 OR 400

7    PEOPLE.

8              SO IF IT'S GOOD ENOUGH FOR THOSE FOLKS

9    WHY NOT IS IT GOOD ENOUGH FOR US?

10             MR. SHENKMAN:  IF YOU LOOK AT THE PEOPLE

11   AND THE POLLS YOU WILL FIND A MARGIN OF ERROR OF

12   THREE MAYBE FOUR PERCENT.

13             AND I CAN'T SPEAK TO WHAT THE TOTAL

14   SAMPLE SIZE OF ANY PARTICULAR POL WITHOUT TAKING A

15   LOOK AT IT, BUT I THINK YOU WILL FIND THE MARGIN OF

16   ERROR IS RIGHT AROUND THREE.

17             THE COURT:  OKAY.  WELL, THAT WOULD SEEM

18   TO ME TO BE HIGHLY SUGGESTIVE THAT 3 TO 4 PERCENT

19   IS WHAT WE OUGHT TO BE SHOOTING FOR HERE AND A

20   SAMPLE OF A FEW HUNDRED PEOPLE, AGAIN PUTTING ASIDE

21   FOR A MOMENT THE ISSUE OF RESPONSE RATE, WOULD BE

22   ADEQUATE TO THE TASK.  TELL ME WHERE I'M MISSING

23   SOMETHING.

24

25             MR. SHENKMAN:  WELL, THERE'S ALSO THE

1    QUESTION OF THE CONFIDENCE LEVEL.  BUT EVEN

2    ASSUMING THAT WE USE THE DEFENDANT'S CONFIDENCE

3    LEVEL OF 95 PERCENT, A MARGIN OF ERROR OF 3 PERCENT

4    WOULD GET US A SAMPLE SIZE NEEDED OF 1,056.

5              THE COURT:  SAYS YOUR EXPERT.

6              MR. SHENKMAN:  YEAH, AND THIS CAN BE

7    CONFIRMED.

8              I THINK WE PROVIDED A WEBSITE WHERE YOU

9    PLUG IN THE NUMBERS AND A MARGIN OF ERROR DESIRED

10   AND THE TOTAL SAMPLE THAT'S NECESSARY.

11             THE COURT:  ALL RIGHT.

12             SO JUST SO THAT I UNDERSTAND YOUR ASK

13   THEN, YOUR ASK OF THIS COURT IS THAT YOU BE

14   PERMITTED TO SAMPLE ENOUGH PEOPLE FROM THE PUTATIVE

15   CLASS SO THAT THE END RESULT IS A SAMPLING WHICH

16   INCLUDES SOMETHING LIKE A 3 OR 4 PERCENT ERROR RATE

17   AND A CONFIDENCE INTERVAL OF SOMETHING LIKE

18   95 PERCENT; IS THAT BASICALLY IT?

19             MR. SHENKMAN:  WE WOULD BE SATISFIED WITH

20   THAT, YOUR HONOR.

21             THE COURT:  OKAY.

22             NOW, THE SECOND ISSUE I WANTED TO DISCUSS

23   WAS THE RESPONSE RATE.  AND YOU POINTED OUT I THINK

24   RIGHTLY THAT NOT EVEN YOU ARE GOING TO REACH OUT TO

25   IN THE SAMPLE IS GOING TO BE THRILLED TO TALK TO

1    YOU.  THEY MAY HAVE ALL SORTS OF REASONS WHY THEY

2    WILL NOT PROVIDE AN ADEQUATE RESPONSE.

3             IF I UNDERSTAND YOUR POSITION THOUGH IS

4    WHAT YOU ARE SAYING IS BECAUSE YOUR YIELD IS GOING

5    TO BE RELATIVELY SMALL, YOU NEED FAR GREATER THAN

6    THE ACTUAL FINAL SAMPLE SIZE ADEQUATE TO THE TASK

7    IN ORDER TO ACHIEVE THE OBJECTIVE; IS THAT

8    BASICALLY IT?

9             MR. SHENKMAN:  CORRECT.  YES, YOUR HONOR.

10            THE COURT:  OKAY.  ALL RIGHT.

11            ALL RIGHT.  WELL, THE THIRD ISSUE I

12   WANTED TO DISCUSS, AND AGAIN I WILL TAKE ANY

13   FURTHER ARGUMENT YOU MAY HAVE ON THESE ISSUES, BUT

14   THE THIRD ISSUE I WANTED TO DISCUSS WAS WHAT

15   EXACTLY OUGHT TO BE SAID TO THESE PEOPLE AND UNDER

16   WHAT CIRCUMSTANCES.

17            AND I RECOGNIZE IT SOMEWHAT BLEEDS INTO

18   THE OTHER MOTIONS THAT ARE BEFORE US, BUT WHY DON'T

19   YOU GIVE ME YOUR THOUGHTS ABOUT HOW TO STRUCTURE

20   THESE, THE SAMPLING, OR TO PUT IT ANOTHER WAY, HOW

21   TO DESIGN THE SAMPLING PROTOCOL SO THAT YOUR

22   LEGITIMATE OBJECTIVES ARE SERVED WITHOUT UNDULY

23   BURDENING THE DEFENSE.

24            MR. SHENKMAN:  SURE.  AND PERHAPS I CAN

25   ADDRESS THE SECOND ISSUE THAT YOU MENTIONED.

9

1                    THE COURT:  HOWEVER YOU LIKE TO.

2                    MR. SHENKMAN:  VERY BRIEFLY.

3                    AND IN THIS INSTANCE I CAN ACTUALLY OFFER

4       MY OWN EXPERIENCE.

5                    WE RECENTLY SETTLED ANOTHER CASE

6       REGARDING A MEMBERSHIP CAMPGROUND IN THE

7       LOS ANGELES SUPERIOR COURT.  AND THERE WERE NO OPT

8       OUTS IN THE HIGHER SUBCLASS.  THERE WERE ABOUT TEN

9       IN THE LOWER PAID SUBCLASS.

10                   BUT WHAT'S IMPORTANT IS THAT THE RESPONSE

11      RATE, EVEN WHEN WE WERE GIVING OUT FREE MONEY AND

12      THE HIGHER SUBCLASS FOR INSTANCE ENDED UP GETTING

13      CLOSE TO A THOUSAND DOLLARS A PERSON, THE RESPONSE

14      RATE WAS STILL IN THE 40'S.

15                   AND HERE WE ARE NOT ABLE TO SAY, WE WILL

16      GIVE YOU MONEY IF YOU TALK TO US.  SO THE RESPONSE

17      RATE I THINK WHAT WE CAN EXPECT IS GOING TO BE

18      SIGNIFICANTLY LOWER.

19                   THE LAST ISSUE THAT YOU MENTIONED -- I'M

20      SORRY, TO REFRESH MY RECOLLECTION AS TO --

21                   THE COURT:  I THINK YOU HAVE SPOKEN TO

22      THIS NOTION THAT OUR PROTOCOL MUST BE DESIGNED SO

23      THAT WE ACCOMMODATE A LESS THAN 100 PERCENT

24      RESPONSE RATE.

25                   NOW WHETHER WE SHOULD PRESUME THE

1    RESPONSE RATE IS GOING TO BE 90 PERCENT OR

2    10 PERCENT I SUPPOSE IS SOMETHING THAT I'M GOING TO

3    HAVE TO MAKE A DECISION ON BASED ON THE RECORD YOU

4    ALL ASSEMBLED.

5              SO I THINK I UNDERSTAND YOUR POINT THERE.

6              MY QUESTION WAS SIMPLY WHETHER YOU HAVE

7    ANY CASE LAW OR OTHER EXPERIENCE TO OFFER THAT

8    WOULD SUGGEST WHAT TYPES OF RESPONSE RATES I OUGHT

9    TO RELY UPON OR ASSUME.

10             I THINK WE DO CITE A CASE IN OUR DOCKET

11   63 ON THE COURT'S DOCKET WHERE THERE WAS A CASE

12   TALKED ABOUT THAT THEY ACHIEVED A RESPONSE RATE OF

13   ABOUT TEN PERCENT.

14             THE COURT:  WELL, I CAN TAKE A LOOK AT

15   THOSE CASES.  THE ADDITIONAL ELEMENT OF MY EARLIER

16   QUESTION TO YOU HAD TO DO WITH WHAT YOU OUGHT TO BE

17   ABLE TO SAY TO THESE FOLKS AND HOW YOU OUGHT TO BE

18   ABLE TO SAY IT.

19             IN OTHER WORDS, THE DEFENDANTS HAVE

20   SUGGESTED TO ME THAT A WRITTEN QUESTIONNAIRE IS

21   SUPERIOR FOR IS THE SUPERIOR METHODOLOGY FOR

22   ELIMINATING CONCERNS OR ABERRATIONS IN THE

23   COMMUNICATIONS.

24             TELL ME YOUR THOUGHTS ABOUT THAT AND TELL

25   ME IF YOU THINK A WRITTEN COMMUNICATION OR SURVEY

1    IS APPROPRIATE, WHY IT SHOULD BE PERMITTED TO TALK

2    TO FOLKS OVER THE PHONE.

3              MR. SHENKMAN:  SURE.

4              FIRST OF ALL, I THINK NOTHING REPLACES A

5    CONVERSATION BETWEEN TWO LIVE PEOPLE ASKING THE

6    QUESTION OF WHAT ARE YOUR EXPERIENCES WITH THOUSAND

7    TRAILS.

8              I DON'T THINK THAT'S SUGGESTIVE, I DON'T

9    THINK IT'S INAPPROPRIATE.  IT COULD LEAD IN A

10   NUMBER OF DIFFERENT DIRECTIONS AND THAT'S WHERE WE

11   WANT TO EXPLORE.

12             AND THAT QUESTION IS REASONABLY

13   CALCULATED TO DISCOVERY OR ADMISSIBLE EVIDENCE.

14             NOW, GETTING INTO THE LEGAL ASPECT OF

15   THIS, IT'S -- I THINK IT'S DEFENDANT'S BURDEN TO

16   SHOW THAT WE HAVE SOMEHOW ABUSED THE PROCESS.  AND

17   THEY HAVEN'T DONE THAT AND WE HAVEN'T --

18             THE COURT:  IS THAT CORRECT, THOUGH,

19   UNDER THE CASE LAW.  IT SEEMS TO ME UNDER SOME OF

20   THE OTHER CASES DISCUSSED IN THE PAPERS THERE'S A

21   PRETTY SIGNIFICANT DISTINCTION HERE IN THAT YOU

22   HAVE COME TO THE COURT AND SOUGHT ESSENTIALLY THE

23   COURT'S INVOLVEMENT IN MANAGEMENT OF THIS PROCESS

24   AS OPPOSED TO SIMPLY GONE OUT AND ENGAGED WITH

25   THESE PEOPLE ON YOUR OWN.

1          SO WHY ISN'T THAT A MATERIAL DIFFERENCE?

2          MR. SHENKMAN:  SURE.

3          I THINK IT CERTAINLY IS A DIFFERENCE, BUT

4     I THINK THE ISSUE COMES DOWN TO HOW BURDENSOME THE

5     RESTRICTION IS.

6          AND YOUR HONOR INCLUDED THREE VERY

7     REASONABLE RESTRICTIONS IN YOUR APRIL 3RD ORDER.

8          AND WHAT THOSE RESTRICTIONS ALLOW IN

9     THOSE INSTANCES IN PARTICULAR THAT WE KEEP A LIST

10    OF ALL THE PEOPLE THAT WE CONTACT.  IT ALLOWS IF

11    THERE'S ANY HINT OF ABUSE OF THE INFORMATION WE

12    DISCOVERED THE CONTACT INFORMATION, THEN DEFENDANTS

13    HAVE A MEANS TO INVESTIGATE IT.  THIS COURT HAS A

14    MEANS TO INVESTIGATE IT.

15         AND IF WE DID ANYTHING WRONG THEN WE WILL

16    BE SANCTIONED.

17         BUT TO -- ABSENT ANYTHING OTHER THAN

18    SPECULATION ABOUT WE ARE GOING TO DO SOMETHING

19    ABUSIVE OR SANCTIONABLE, THESE SORTS OF

20    RESTRICTIONS ABOUT ALLOWING THEM TO EAVESDROP ON

21    OUR PHONE CALLS, YOU KNOW, HAVE THEM PRE APPROVE

22    QUESTIONS THAT WE ASK, THOSE RESTRICTIONS ARE SO

23    RESTRICTIVE SUCH THAT IT WOULD NOT ALLOW US TO

24    CONDUCT A REASONABLE INVESTIGATION.

25         THE COURT:  ALL RIGHT.

1          WELL, THE ONLY OTHER QUESTION I WANTED TO

2     PUT TO YOU AND INVITE A DISCUSSION ON HAS TO DO

3     WITH WHO YOU OUGHT TO BE ABLE TO CONTACT.

4          THE DEFENDANTS HAVE SUGGESTED THAT THE

5     POTENTIAL CLASS HERE IS NOT SIMPLY ALL MEMBERS OF

6     THEIR PROGRAMS BUT A PARTICULAR PROGRAM.  TELL ME

7     WHY THAT'S EITHER REASONABLE OR UNREASONABLE.

8          MR. SHENKMAN:  WELL, FIRST, THIS ISN'T

9     THE PROPER PLACE FOR THAT ARGUMENT.  I MEAN, THAT

10    ARGUMENT WILL BE MADE AT THE CLASS CERT.

11         THE COURT:  THAT'S A CLASS CERT QUESTION.

12         MR. SHENKMAN:  RIGHT.

13         THE MOTION IS TO DISMISS CLASS

14    ALLEGATIONS, MOTIONS TO STRIKE CLASS ALLEGATIONS,

15    THEY ARE VERY DISFAVORED AND THE DEFENDANTS HAVEN'T

16    MADE SUCH A MOTION BECAUSE THEY COULDN'T.

17         BUT GETTING TO THE FACTUAL ISSUE HERE, WE

18    BELIEVE THAT THE CLASS IS PROPERLY PLED AND I WILL

19    GIVE YOU ONE EXAMPLE.

20         WE ALLEGE THAT THE VIOLATION OF THE

21    ARIZONA MEMBERSHIP CAMPGROUND LAW AND THE FESKE'S

22    ARE RESIDENTS OF CALIFORNIA.  AND DEFENDANTS WILL

23    TELL YOU WELL, THEY CAN'T BE REPRESENTATIVES OF

24    VIOLATION OF ARIZONA LAW.

25         BUT THE ARIZONA LAW, LIKE THE OTHER STATE

1    MEMBERSHIP CAMPGROUND LAWS, ARE SPECIFICALLY

2    DIRECTED TO NONRESIDENTS.

3              SO FOR EXAMPLE WITH THE ARIZONA

4    MEMBERSHIP CAMPGROUND LAW, IF A MEMBERSHIP

5    CAMPGROUND OPERATOR IS SELLING MEMBERSHIPS FOR A

6    CAMPGROUND LOCATED IN ARIZONA AS THOUSAND TRAILS

7    DOES AND THEY ARE SELLING IT TO NONRESIDENTS, THE

8    DISCLOSURES IN THE CONTRACT ACTUALLY HAVE TO BE

9    DIFFERENT THAN IF IT'S FOR RESIDENTS OF ARIZONA.

10             THEY ARE ACTUALLY MORE FAVORABLE TO

11   NONRESIDENTS.

12             THE COURT:  SO YOU ARE SAYING THAT PEOPLE

13   INSIDE ARIZONA HAVE LESS PROTECTION UNDER THEIR

14   STATE LAW THAN PEOPLE OUTSIDE.

15             MR. SHENKMAN:  YOU WOULD NEVER FIND THAT

16   IN CALIFORNIA, I'M SURE.  BUT, YES, NEVADA IS

17   SIMILAR IN THAT RESPECT.

18             THE COURT:  SO IN ANY EVENT, I TAKE IT

19   THEN YOUR BASIC POINT THERE IS THAT YOUR COMPLAINT

20   INCLUDES ALLEGATIONS OF HOW THE CLASS OR SET OF

21   CLASS OUGHT TO BE DEFINED AND THE DISCOVERY YOU ARE

22   SEEKING IS PROPERLY DIRECTED TOWARDS THE FULL SCOPE

23   OF THAT SET OF CLASSES, NOTHING MORE, NOTHING LESS.

24             MR. SHENKMAN:  CORRECT.

25             THE COURT:  ALL RIGHT.

1        IS THERE ANYTHING ELSE YOU WISH TO ADD TO

2    YOUR PAPERS?

3            MR. SHENKMAN:  NO, YOUR HONOR.

4            THE COURT:  ALL RIGHT.  THANK YOU.

5            MR. BRADFORD?

6            MR. BRADFORD:  THANK YOU, YOUR HONOR.

7        I WOULD LIKE TO RESPOND TO EACH OF THE

8    COURT'S QUESTIONS.

9            THE COURT:  HOWEVER YOU LIKE.

10           MR. BRADFORD:  IF THE COURT THINKS THAT'S

11   HELPFUL.

12       I WOULD LIKE TO SAY AT THE OUTSET THAT

13   OUR CONCERNS BOTH ABOUT THE NUMBER OF NAMES AND

14   WHAT MIGHT BE ASKED AND WHO MIGHT BE ASKED ARE

15   STRONGLY ANIMATED BY WHAT WE THINK IS A VERY UNIQUE

16   POTENTIAL FOR HARM TO OUR PROGRAM.  THAT NONE OF

17   THE CASES THAT HAVE BEEN CITED TO THE COURT DEAL

18   WITH AN ONGOING MEMBERSHIP, CUSTOMER RELATIONSHIP.

19       AND WE HAVE SUBMITTED TWO AFFIDAVITS ON

20   THIS POINT, OUR GENERAL COUNSEL IS HERE BECAUSE

21   THIS IS AN ISSUE OF DEEP CONCERN TO THE COMPANY.

22       UNLIKE A LOT OF CONSUMERS, THE MEMBERS OF

23   OUR PROGRAM ARE LONG STANDING MEMBERS.  OVER

24   90 PERCENT OF THE MEMBERSHIP IS A LEGACY

25   MEMBERSHIP.  AND LEGACY MEMBERS ARE IN THE PROGRAM

16

1      FOR AN AVERAGE OF SEVEN YEARS.

2             SO IF WE LOSE ONE MEMBER BECAUSE OF THIS

3      INQUIRY, THAT'S A BIG DEAL TO US.  BUT BEYOND THAT,

4      MOST OF OUR MEMBERS COME FROM REFERRALS.

5             SO IF WE LOSE ONE MEMBER, WE ARE AFRAID

6      WHAT THEY MIGHT SAY TO ANOTHER MEMBER ABOUT THIS

7      COMPANY IS IN LEGAL TROUBLE OR THERE'S A LAWSUIT,

8      COULD REALLY HAVE A VIRAL IMPACT ON THE ENTIRE

9      BUSINESS AND THAT'S WHY WE ARE HERE AND WHY THESE

10     ISSUES ARE SUCH GRAVE CONCERN TO US.

11            IN TERMS OF THE NUMBER --

12            THE COURT:  BEFORE YOU TURN TO THE

13     NUMBER, I APOLOGIZE FOR INTERRUPTING YOU,

14     MR. BRADFORD.

15            ON THIS NOTION OF THE NATURE OF YOUR

16     CLIENT RELATIONSHIPS AND ITS SIGNIFICANCE TO THE

17     LINE I OUGHT TO DRAW HERE, IN ANY OF THE CASES -- I

18     UNDERSTAND THAT YOUR POINT IS NONE OF THESE CASES

19     SEEM TO ADDRESS THIS PARTICULAR CONCERN.

20            HAVE YOU FOUND ANY CASES WHICH OFFER

21     AFFIRMATIVE SUPPORT TO YOUR POSITION?  IN OTHER

22     WORDS, HAS A COURT EVER CONSIDERED THAT PARTICULAR

23     CLIENT RELATIONSHIP IN THIS CONTEXT?

24            MR. BRADFORD:  YES, YOUR HONOR.

25            IN CHARTWELL WHICH THE OTHER SIDE CITES,

1      I BELIEVE THAT'S A SEVENTH CIRCUIT CASE, THE COURT

2      SAYS AND IT MAY BE CONSIDERED DICTA BUT THE COURT

3      SAYS IMPACT ON THE CUSTOMER RELATIONSHIP WOULD BE A

4      VALID REASON TO LIMIT COMMUNICATIONS.

5              HOWEVER, ON THE RECORD BEFORE US, WE

6      DON'T HAVE A BASIS TO DECIDE ONE WAY OR ANOTHER AND

7      THE REMAND FOR FURTHER CONSIDERATION OF THAT ISSUE.

8      BUT OBVIOUSLY THEY RECOGNIZE THAT WAS A LEGITIMATE

9      CONCERN.

10             IN THE PIONEER CASE DEALING WITH THE

11     DEFECTIVE DVR, THE COURT NOTES THAT THE ONLY

12     INQUIRY THEY ARE ALLOWING ARE OF THOSE PEOPLE WHO

13     HAVE ALREADY COMPLAINED ABOUT THE PRODUCT.

14             SO YOU HAVE PEOPLE WHO ARE ALREADY

15     UNHAPPY WHO WOULD PRESUMABLY WANT THEIR GRIEVANCES

16     TO BE KNOWN RATHER THAN INQUIRING ABOUT THE HAPPY

17     CUSTOMERS.

18             OF COURSE THE FESKE'S HAVE QUIT THE

19     PROGRAM SO THEY DON'T HAVE THE SAME SET OF CONCERNS

20     AS THE PEOPLE WHO WERE STILL ACTIVE MEMBERS.

21             AND AGAIN, IT'S HARD TO FIND A PARALLEL

22     BUSINESS WHERE THERE'S AN ON GOING RELATIONSHIP

23     THAT'S BUILT UPON TRUST AND WHERE THE NATURE OF THE

24     BUSINESS IS REALLY A SOCIAL NETWORK.

25             AND WE PUT IN A LOT OF EVIDENCE ABOUT

1    THAT BUT CAMPING HAS BEEN CALLED THE ORIGINAL

2    SOCIAL NETWORK BECAUSE PEOPLE COME TOGETHER AT THE

3    CAMPFIRE, WE BUILD SOCIAL CENTERS FOR THEM,

4    SWIMMING POOLS.  THEY TALK TO EACH OTHER, ANYTHING

5    TO DO WITH CAMPING WOULD BE AN ISSUE OF COMMON

6    CONCERN.

7              SO THIS IS MY HOBBY WITH ALL THE REST OF

8    THE PEOPLE.  IF I GET AN INQUIRY ABOUT A LAWSUIT

9    IT'S VERY LIKELY I'M GOING TO TALK TO OTHER PEOPLE

10   AT THE CAMPGROUND ABOUT THAT.  IF I QUIT THE

11   PROGRAM, IT'S VERY LIKELY OTHER PEOPLE COME THERE

12   BECAUSE I COME THERE AND ARE MY FRIEND TOO.

13             SO NOT ONLY DO WE LOSE THE REFERRALS BUT

14   THIS CAN HAVE A REAL SPIRALLING AFFECT ON OUR

15   BUSINESS.

16             AND IT'S THE JUDGMENT OF THE BUSINESS

17   PEOPLE THAT THIS COULD BEING EXTREMELY HARMFUL TO

18   THE BUSINESS IN A WAY THAT NOTHING HAS EVER BEEN

19   HARMFUL BEFORE.

20             SO IN THAT CONTEXT, IN TERMS OF DEALING

21   WITH THE NUMBER OF NAMES I THINK YOUR HONOR ASKED A

22   VERY INSIGHTFUL QUESTION WHICH IS WHAT'S THE

23   PURPOSE FOR WHICH THE INFORMATION IS BEING USED?

24   BECAUSE FOR SOME ISSUES, PRECISION IS IMPORTANT.

25             WE ARE AT A PRELIMINARY STAGE OF

 1   CERTIFICATION.  WE AS THE DEFENDANTS ARE WILLING TO

 2   LIVE WITH THE TEN PERCENT MARGIN OF ERROR.  SO IF

 3   THEY COME IN WITH RESULTS THAT SOMEHOW ARE RELEVANT

 4   TO CERTIFICATION AND THEY CAN SAY 60 TO 80 PERCENT

 5   OF THE PEOPLE BELIEVE THIS OR GOT THAT, WE WILL

 6   WAIVE ANY OBJECTION TO THE CONTENTION THAT THAT'S

 7   NOT SPECIFIC ENOUGH TO BE RELIED UPON.

 8            IN MANY RESPECTS I KNOW THE COURT HAS AN

 9   INDEPENDENT DUTY TO MAKE ITS OWN DETERMINATION.

10   BUT FROM OUR STANDPOINT WE RECOGNIZE THAT RIGHT NOW

11   IS A QUESTION OF, WE'VE GOT 9,000 DIFFERENT --

12   10,000 DIFFERENT DUES, RATES, WE'VE GOT HUNDREDS OF

13   DIFFERENT PROGRAMS, IS THERE ANYTHING IN COMMON

14   AMONG ANY OF THESE PEOPLE IF THEY CAN GET TO

15   50 PERCENT OR 60 PERCENT, THEN THAT SAYS SOMETHING.

16            IF THE NUMBER IS 10 PERCENT OR

17   20 PERCENT, THAT TELLS US SOMETHING DRAMATICALLY

18   DIFFERENT.

19            WE DON'T NEED TO GET TO THE LEVEL OF

20   PRECISION NOR HAVE THEY IDENTIFIED A SINGLE

21   QUESTION WHERE IT WOULD BE CRITICAL TO KNOW, IS THE

22   ANSWER A RANGE OF THREE PERCENT AS OPPOSED TO A

23   RANGE OF TEN PERCENT.

24            AND I NOTE ON THEIR CASE LAW DISCUSSION,

25   IT REALLY IS MISLEADING TO SAY THE COURTS HAVE

1    REJECTED THREE PERCENT.  THE STENDER CASE, THE

2    PARTIES STIPULATED TO THREE PERCENT.  HERE I WILL

3    STIPULATE TO TEN PERCENT.

4         SO JUDGE PATEL SAID FIVE PERCENT IS NOT

5    ALLOWABLE BECAUSE THE PARTIES AGREED TO THREE

6    PERCENT.  HE DIDN'T MAKE A JUDGMENT THAT FIVE

7    PERCENT WAS WRONG.

8         THE TOLEDO CASE WHICH THEY SAY THE COURT,

9    A FLORIDA CASE WHERE THEY SAID THE COURT CALLED

10   TEN PERCENT UNUSUALLY HIGH, IF YOU READ THE OPINION

11   THAT'S A QUOTE FROM ONE SIDE, AN EXPERT REPORT.

12   THE COURT DIDN'T ADOPT THAT, THEY JUST TOOK THAT

13   SNIPPET FROM OUT OF THE PARAGRAPH FROM QUOTING THE

14   EXPERT REPORT.  THERE WAS AN 85 PERCENT CONFIDENCE

15   LEVEL NOT 95 PERCENT THAT'S WHAT BOTHERED THE COURT

16   THERE.

17        AND BONITA AND WINE WORLD CONCERNS

18   STATISTICAL SAMPLING IN A UNION ELECTION.  WHICH IS

19   AGAIN, IN AN ELECTION YOU NEED TO KNOW REALLY WHO

20   WON OR WHO IS LIKELY TO HAVE WON, IT'S A DIFFERENT

21   QUESTION.

22        PEOPLE V. BUTLER 670 NEW YORK 2D 81 USED

23   A TEN PERCENT MARGIN OF ERROR.

24        PEOPLE V. MCLAURIN, ANOTHER CASE AT 598

25   NEW YORK 2D 911, USED A TEN PERCENT MARGIN OF

21

1    ERROR.  HAYDEL V. COMMERCIAL UNION INSURANCE, 617

2    SO 2D 137, USED A TEN PERCENT MARGIN OF ERROR.

3              SO THIS IS USED WHERE IT'S APPROPRIATE.

4    WE THINK IT'S APPROPRIATE HERE.  ON THIS ISSUE OF

5    THE RESPONSIVENESS OF THE CUSTOMERS, OUR CUSTOMERS

6    ARE VERY ENGAGED, THEY ARE VERY RESPONSIVE.

7              THERE'S NO REASON TO PRESUME THAT THEY

8    WOULD NOT RESPOND AT A HIGH LEVEL.  BUT IT WOULD BE

9    VERY EASY TO START OUT WITH THE A NUMBER OF NAMES

10   THAT'S NECESSARY TO ACHIEVE 10 PERCENT, THAT'S 62

11   TO 96 NAMES.

12             IF THEY GET A 50 PERCENT RESPONSE RATE WE

13   WILL GIVE THEM THAT NUMBER OF NAMES AGAIN.  IF THEY

14   GET A 20 PERCENT RESPONSE RATE WE WILL GIVE THEM

15   FOUR TIMES.  THAT COULD HAPPEN QUICKLY BUT THERE'S

16   NO REASON TO BE CONTACTING ALL OF THOSE CUSTOMERS

17   WITH ALL THE IMPLICATIONS BEFORE WE KNOW WHAT'S

18   MINIMALLY NECESSARY TO GET THE JOB DONE.

19             AND SO WE THINK THAT RESPONSE RATE ISSUE

20   CAN BE DEALT WITH AS WE GO FORWARD.

21             THE COURT:  SO I'M SORRY TO INTERRUPT

22   THERE, BUT YOUR COMMENTS PROMPTED A THOUGHT AND I

23   WANT TO EXPLORE IT.

24             AS I THINK ABOUT THIS IF I ACCEPT FOR THE

25   PURPOSES OF THIS DISCUSSION THAT YOU HAVE A UNIQUE

1    SITUATION HERE WITH YOUR CUSTOMERS AND A UNIQUE

2    DYNAMIC WITH YOUR CUSTOMERS, IT WOULD SEEM TO ME

3    THE PREJUDICE OR BURDEN YOU ARE TRYING TO MITIGATE

4    HERE COULD BE MITIGATED IN ONE OF TWO PRIMARY WAYS.

5            ONE WAY WOULD BE TO SAY LET'S LIMIT THE

6    NUMBER OF PEOPLE THAT ARE EXPOSED TO THIS

7    POTENTIALLY CONTAMINATING PROCESS.  THAT'S MY WORD,

8    NOT ANYONE ELSE'S.  ANOTHER WAY WOULD BE TO SAY

9    LET'S STRUCTURE THE COMMUNICATIONS THEMSELVES SO

10   THAT WHOMEVER IS EXPOSED TO THIS WILL NOT DRAW

11   UNDUE INFERENCE FROM WHAT'S HAPPENING.

12           IT WOULD APPEAR THAT PARTICULARLY WHERE

13   THIS IS A VIRAL COMMUNITY ISSUE AS YOU DESCRIBED

14   IT, AND IT'S LIKELY THAT WORD TO A FEW IS GOING TO

15   LEAD TO WORD TO MANY, THAT IF WE FOCUSED ON GETTING

16   THE DYNAMICS OF THE COMMUNICATION RIGHT AND

17   STRUCTURING, THAT PERHAPS USING A WRITTEN

18   COMMUNICATION QUESTIONNAIRE, WE MIGHT MORE

19   SIGNIFICANTLY MITIGATE THE RISK THAN IF WE WERE TO

20   UNDULY SAY YOU ONLY GET TO TALK TO 62 PEOPLE.

21           DOES THAT MAKE SENSE?

22           MR. BRADFORD:  IT MAKES 100 PERCENT, AND

23   I COMPLETELY AGREE WITH THAT.

24           THESE ARE BOTH PROTECTIONS, BUT I WOULD

25   AGREE THERE'S FAR MORE PROTECTION IN MAKING SURE

1    THAT THE COMMUNICATIONS ARE NEUTRAL AND NOT

2    MISLEADING.  AND AT THE SAME TIME DOING THAT WILL

3    ACTUALLY ENHANCE THE RELIABILITY OF THE

4    INFORMATION.

5           SO THERE'S NO DISPUTE ABOUT WAS A

6    QUESTION NEEDLESSLY SUGGESTIVE, AND I KNOW THIS

7    WOULD NEVER HAPPEN INTENTIONALLY BUT SOMETHING

8    COULD BE INADVERTENTLY MISLEADING TO PEOPLE

9    PARTICULARLY IF IT'S NOT RELEVANT TO THEIR PROGRAM.

10          SO I THINK GETTING THOSE ISSUES AND

11   OBJECTIONS OUT ON THE TABLE AND HAVING A WRITTEN

12   QUESTIONNAIRE WOULD NOT ONLY GO A LONG WAY TOWARD

13   MITIGATING THE CONCERNS WE HAVE BUT IT WOULD ALSO

14   ACTUALLY ENHANCE THE RELIABILITY OF THE INFORMATION

15   WHICH SHOULD BE IN ALL OF OUR INTEREST HERE TO

16   ACCOMPLISH THAT.

17          AND IF THERE'S GOING TO BE OBJECTIONS TO

18   PARTICULAR QUESTIONS, WHY NOT GET THOSE SORTED OUT

19   AT THE FRONT END RATHER THAN FIGHTING ABOUT IT

20   LATER AND PERHAPS HAVING TO REDO THIS.  WE JUST

21   ASSUMED THAT THE RESULTS THAT THEY REACH HERE

22   ACTUALLY BE RELIABLE.

23          WE ARE HAPPY TO WORK WITH THEM TO MAKE IT

24   RELIABLE AND THAT'S A LITTLE BIT LIKE WRITING A

25   BLIND CHECK NOT KNOWING WHAT THE MEMBERS WILL SAY.

24

1    BUT WE HAVE A HIGH CONFIDENCE THAT IF THIS IS DONE

2    FAIRLY AND RELIABLY, IT WILL SHOW THE WIDE

3    DIVERSITY OF EXPERIENCES AND THE UNFEASIBILITY OF

4    CLASS REPRESENTATION.  BUT WHATEVER IT SHOWS, IT

5    WILL SHOW IT RELIABLY.  THAT'S THE IMPORTANT POINT.

6    AND WE WOULD FULLY COOPERATE WITH THAT PROCESS.

7           OBVIOUSLY, WE STILL WANT TO LIMIT THE

8    NAMES TO THAT WHICH IS REASONABLY AND MINIMALLY

9    NECESSARY BECAUSE THERE'S STILL RISK NO MATTER HOW

10   THE QUESTIONS ARE PUT.  BUT I WOULD AGREE WITH THE

11   COURT THAT IF I HAD TO PRIORITIZE CLEARLY PUTTING

12   THE COMMUNICATIONS IN A NEUTRAL WAY IS IMPORTANT.

13          IN TERMS OF THE WHO SHOULD BE ASKED, IF

14   WE GO BACK TO THE DUKE CASE, DUKE SAYS THAT A CLASS

15   CLAIM CANNOT BE ANY LARGER THAN THE CLAIMED

16   REPRESENTATIVE PLAINTIFF.  PLAINTIFF CAN'T SUE FOR

17   CLAIMS THAT HE OR SHE PERSONALLY DOESN'T HAVE.

18          AND A NUMBER OF COURTS HAVE SAID AND

19   THEREFORE DISCOVERY IS LIMITED TO THE CLAIMS THAT

20   THE PLAINTIFF HIMSELF OR HERSELF COULD BRING, THE

21   SOTO CASE SPECIFICALLY HOLDS THAT AND DOESN'T ALLOW

22   DISCOVERY ON CERTAIN POLICIES THAT THE PLAINTIFF

23   COULDN'T RAISE.

24          THERE'S THREE CASES.  MARTINET, ACEVEDO,

25   AND CURRIE-WHITE WHICH ARE CITED IN THE BRIEFS

1    WHERE THE COURT SAYS WE ARE ONLY GOING TO GIVE YOU

2    NAMES AND ADDRESSES OF PEOPLE YOU CAN ACTUALLY

3    REPRESENT BECAUSE YOU MAY BE ASSERTING A CLASS-WIDE

4    CLAIM OF HUNDREDS OF THOUSANDS OF PEOPLE, BUT IF

5    YOU DON'T HAVE THAT CLAIM, IF YOU DON'T REPRESENT

6    THOSE PEOPLE OR COULDN'T REPRESENT THEM, THAT'S

7    SOMETHING THAT GETS DETERMINED IN THE CONTEXT OF

8    DISCOVERY.  THERE'S NO BASIS TO LET YOU INQUIRE OF

9    SOMEBODY YOU COULDN'T PLAUSIBLY REPRESENT.

10              THE COURT:  DOESN'T THAT LOGIC INVITE ME

11   TO PUT THE CART BEFORE THE HORSE HERE?

12              IF I HAVE TO DETERMINED THE

13   REPRESENTATIVENESS ARE SUFFICIENT OF THE PLAINTIFFS

14   IN REPRESENTING A BROADER CLASS HERE BEFORE I EVEN

15   ALLOW DISCOVERY UP TO THE FULL LIMITS OF WHAT'S

16   PLED, I AGREE THE PLEADINGS SHOULD SET SOME

17   BOUNDARIES.

18              BUT HOW AM I NOT PUTTING THIS ALL

19   BACKWARDS?

20              MR. BRADFORD:  CERTAINLY.

21              HERE I THINK IT'S VERY SIMPLE IN THESE

22   CASES AS WELL.  IT'S A QUESTION OF WHAT PRODUCT OR

23   SERVICE DID THEY BUY?

24              SO WE WOULD AGREE THE PLAINTIFFS ON THE

25   FACE OF THIS COULDN'T GO OFF AND SUE ANOTHER

1    COMPANY OR SUE FOR A SERVICE THAT THEY NEVER

2    PURCHASED.

3            THE NACO PROGRAM IS A -- WAS A COMPANY

4    THAT STOPPED SELLING MEMBERSHIPS IN 1989, THAT'S

5    WHAT THEIR PARENTS BOUGHT.  THERE HASN'T BEEN A

6    SINGLE MEMBERSHIP SOLD SINCE 1989.

7            THIS IS A LEGACY PROGRAM, THERE'S 6,000

8    PEOPLE WHO BOUGHT BEFORE 1989 WHO ARE STILL MEMBERS

9    OF THIS PROGRAM.

10           THEY HAVE A LIST OF THE 20 CAMPGROUNDS

11   THAT THEY CAN USE, THAT'S IN THE DOCUMENTS THEY

12   PRODUCED TO US, BUT THEY SAY YOU DIDN'T GIVE US A

13   GOOD ENOUGH DESCRIPTION OF WHAT CAMPGROUNDS WE NACO

14   MEMBERS COULD USE.

15           THERE'S BEEN PUBLIC CAMPING AT THE

16   CAMPGROUNDS SINCE THEIR PARENTS BOUGHT.  THAT'S HOW

17   MOST MEMBERS COME IN IS THEY COME IN AS PUBLIC

18   CAMPERS THEN THEY ARE GIVEN A SALES PRESENTATION.

19   NOT A SINGLE NACO MEMBER THAT BOUGHT ON THE

20   INTERNET WHEN THEY BECAME MEMBERS, THEY ALL BOUGHT

21   AT THE CAMPGROUND, THEY COULD SEE THE PUBLIC

22   CAMPING, BUT THEY WANT TO COMPLAIN NACO MEMBERS

23   WEREN'T TOLD ABOUT PUBLIC CAMPING.

24           THOSE ARE CLAIMS ABOUT WHAT THE NACO

25   MEMBERS HAVE BEEN TOLD.  WHAT'S BEEN TOLD TO PEOPLE

1    WHO BOUGHT THROUGH WHAT WAS THEN A DIFFERENT

2    COMPANY, THOUSAND TRAILS IS NOT SOMETHING THAT

3    THESE PLAINTIFFS COULD COMPLAIN ABOUT.

4              SO WE ARE SIMPLY SAYING LIMIT IT TO THE

5    PARTIES WHO MADE THE REPRESENTATIONS TO THEM THAT

6    WERE RELEVANT TO THEIR PURCHASING DECISION, LIMIT

7    IT TO THE PRODUCT THAT THEY BOUGHT.

8              AND WE TAKE IT ONE STEP FURTHER BECAUSE

9    AGAIN, THE WAY THE PEOPLE MAKE THEIR PURCHASING

10   DECISIONS IS TO GO TO A CAMPGROUND.

11             THE CAMPGROUND THAT THE PLAINTIFFS'

12   PARENTS BOUGHT AT WILDERNESS LAKE WAS ONE OF THE

13   MOST POPULAR OF ALL CAMPGROUNDS.  PEOPLE WERE

14   BROUGHT IN, GIVEN THE SALES PROMOTIONS AND MAYBE

15   PEOPLE DECIDED TO KEEP COMING BACK YEAR AFTER YEAR.

16             SO WE SAY LET'S TAKE A LOOK AT ALL THE

17   PEOPLE WHO PURCHASED WILDERNESS LAKE AND LET'S SEE

18   WHAT THEY WERE TOLD.

19             THAT'S REALLY WHAT'S RELEVANT TO THESE

20   PARTICULAR PLAINTIFF'S CLAIMS.

21             AND THE FACT THEY PUT SOMETHING ON A

22   PIECE OF PAPER IN THE COMPLAINT DOESN'T GIVE THEM A

23   LICENSE TO GO PHISHING ON THINGS THAT AREN'T

24   RELEVANT TO THEIR OWN COMPLAINT.

25             COUNSEL'S SAID IT IN THEIR BRIEFS AND

1    TODAY WE'VE ASKED REPEATEDLY, WHAT QUESTION DO YOU

2    WANT TO ASK ANYBODY?

3            THE ONLY ANSWER WE'VE HEARD IS WE WOULD

4    LIKE TO ASK THE QUESTION, TELL US ABOUT YOUR

5    EXPERIENCE WITH THOUSAND TRAILS.

6            WELL FIRST OF ALL, THE FESKE'S HAVEN'T

7    HAD AN EXPERIENCE WITH THOUSAND TRAILS, THEY HAD AN

8    EXPERIENCE WITH THE NACO MEMBERSHIP PROGRAM, IT WAS

9    SOLD BY THE NACO COMPANY.

10           BUT SECOND, TELL US ABOUT YOUR

11   EXPERIENCE.  THEN THE PLAINTIFFS GO ON TO SAY, AND

12   MAYBE WE WILL LEARN SOMETHING WE DIDN'T KNOW THAT

13   WE SHOULD INVESTIGATE THAT'S OUTSIDE THE BOUNDS OF

14   THE PHISHING DISCOVERY, THAT'S THE TRUE PHISHING

15   EXPEDITION.

16           TELL US EVERYTHING YOU KNOW, FEEL, THINK

17   ABOUT WHATEVER CAMPING PROGRAM YOU ARE IN AND MAYBE

18   SOMETHING WILL COME TO THE TABLE THAT'S INTERESTING

19   TO US.

20           THAT'S NOT A PERMISSIBLE USE OF DISCOVERY

21   GIVEN THE TYPE OF HARM THAT THESE INQUIRIES COULD

22   CREATE HERE.

23           IF THEY'VE GOT A SPECIFIC QUESTION ABOUT

24   THE THREE SPECIFIC THINGS THEY'VE COMPLAINED ABOUT

25   WHICH IS ONE, THEY SAY THEY WEREN'T TOLD ADEQUATELY

1    WHAT CAMPGROUNDS THEY COULD USE IN THE NACO

2    PROGRAM.  TWO, THEY SAID THEY WEREN'T TOLD THERE

3    WOULD BE PUBLIC CAMPING IN THE NACO PROGRAM, 3 OR

4    4 PERCENT OF THE SITES ARE PUBLIC CAMPING SITES.

5             AND THREE, THEY SAY WE DIDN'T FULLY

6    UNDERSTAND THAT THERE'S NO RETROACTIVE MONEY BACK

7    GUARANTEE THAT IF WE QUIT WITHIN THE COURSE OF A

8    YEAR WE GET A REFUND BUT WE DON'T GET A WHOLE

9    REFUND.

10            THOSE ARE THEIR SPECIFIC COMPLAINTS.  IF

11   THERE'S QUESTIONS ABOUT THOSE COMPLAINTS IN THE

12   NACO PROGRAM AND THEY HAVE OBJECTIVE AND NEUTRAL

13   QUESTIONS, THAT'S WHERE WE SHOULD AT LEAST START

14   THIS DISCOVERY WITHOUT THEM SHOWING THAT THEY'VE

15   GOT A CLAIM THAT COULD BE BROUGHT ON BEHALF OF

16   THOUSAND TRAIL MEMBERS WHEN THEY ARE NOT A THOUSAND

17   TRAIL MEMBERS WHEN THE EXPERIENCE OF THOSE MEMBERS

18   IS NOT WHAT'S -- WHAT INFORMATION IS GIVEN AT THE

19   NACO PROGRAM.

20            AND AGAIN, WHETHER THERE'S PUBLIC CAMPING

21   AT A CAMPGROUND THEY CAN'T USE IS BEYOND THE SCOPE

22   OF WHAT THEIR SPECIFIC CLAIM IS.

23            SO FOR THAT REASON, AND I WOULD SAY THIS

24   MAY BE LESS IMPORTANT THAN RESTRICTING THE

25   QUESTIONS IN THE FIRST PLACE SO THAT THERE'S NO

30

1    MISLEADING SUGGESTIONS, BUT FOR OUR MEMBERS TO EACH

2    HEAR THAT THERE'S A LAWSUIT AND ATTORNEYS ARE

3    INVESTIGATING WRONGDOING, THAT IS GOING TO HAVE A

4    TRULY VIRAL AND VERY NEGATIVE IMPACT ON OUR

5    BUSINESS.

6            AND I THINK THERE'S A WAY FOR BOTH

7    PARTIES HERE TO GET WHAT THEY NEED WHICH IS

8    RELIABLE INFORMATION ABOUT THE SPECIFIC ISSUES THAT

9    THE FESKE'S COULD PLAUSIBLY BRING A CLAIM ABOUT

10   THROUGH WRITTEN QUESTIONS TO A REASONABLE NUMBER.

11           AND I WOULD SAY, AGAIN, TEN PERCENT IS A

12   NUMBER WE WILL LIVE WITH IN TERMS OF ADEQUACY.  AND

13   IF THAT MEANS THAT YOUR HONOR SAYS WELL, AT THE

14   MARGIN IT'S NOW SHOWN ON THE UPPER END THAT COULD

15   BE 40 PERCENT OR THAT COULD BE 60 PERCENT, WE ARE

16   GOING TO WAIVE THE ARGUMENT THAT WELL, IF THE

17   MARGIN BARRIER WAS LESS, IT MIGHT NOT BE SO HIGH.

18           I THINK FOR PURPOSES OF DETERMINING DO WE

19   HAVE A PLAUSIBLE CLASS HERE, THAT'S MORE THAN

20   ADEQUATE FOR PRESENT PURPOSES.

21           IF THERE'S A SHOWING FURTHER IN THE CASE

22   THAT SOMETHING MORE NEEDS TO BE DONE, OBVIOUSLY

23   THAT COULD BE VISITED WITH.  THE ALTERNATIVE,

24   YOUR HONOR, I WOULD SAY IS JUST BECAUSE THIS FORM

25   OF DISCOVERY IS SO POTENTIALLY INJURIOUS TO OUR

31

1    BUSINESS WOULD BE TO DO EVERYTHING ELSE THAT WE CAN

2    DO BY WAY OF DISCOVERY.

3             WE HAVEN'T HAD A CHANCE TO TAKE THEIR

4    DEPOSITIONS.  WE HAVE BEEN ASKING FOR THAT FOR A

5    LONG TIME.  WE WILL BE GIVE THEM EVERY 30(B)(6)

6    DEPOSITION THEY ARE ASKING FOR.

7             WE'RE HAPPY TO PUT OFF THE HEARING ON

8    THIS.  LET THEM MAKE A PRELIMINARY SHOWING OF WHY

9    THIS IS EVEN A PLAUSIBLE CLASS ACTION --

10            THE COURT:  I THINK, TO BE FAIR, WE'VE

11   CROSSED A FEW BRIDGES HERE GETTING TO THIS POINT.

12            MR. BRADFORD:  I APPRECIATE THAT,

13   YOUR HONOR.

14            I OFFER THIS AS A PRACTICAL SUGGESTION,

15   I'M NOT SAYING THE COURT WOULD GO BACK ON ITS

16   RULING BUT WE MIGHT BE ABLE TO FOCUS AND GUIDE WHAT

17   THE NECESSARY INQUIRY IS IF WE SEQUENCED IT THAT

18   WAY.

19            SO THAT'S JUST A SUGGESTION TO TRY TO

20   ACHIEVE THE SAME TYPE OF RESULTS.

21            I'M MORE THAN HAPPY TO ANSWER ANY

22   QUESTIONS.

23            THE COURT:  I THINK YOU'VE ANSWERED ANY

24   QUESTIONS I HAD, MR. BRADFORD.

25            WE ARE ABOUT OUT OF TIME, UNFORTUNATELY,

1    SO UNLESS THERE'S A FINAL POINT YOU WISH TO MAKE --

2                MR. BRADFORD:  I THINK YOU HONOR

3    ACCURATELY STATED THE FIRST AMENDMENT LAW BECAUSE

4    THEY ARE SEEKING DISCOVERY.  I THINK YOUR HONOR HAS

5    THE AUTHORITY TO LOOK AT POTENTIAL HARM AND DOESN'T

6    HAVE TO FIND ACTUAL PRIOR HARM IN ORDER TO LIMIT

7    THIS IN A WAY TO ACHIEVE STATISTICALLY SIGNIFICANT

8    RELIABLE INFORMATION.

9                THANK YOU VERY MUCH, YOUR HONOR.

10               THE COURT:  THANK YOU VERY MUCH.

11               REBUTTAL?

12               MR. SHENKMAN:  THANK YOU, YOUR HONOR.

13               MAYBE I SHOULD ADDRESS THE LAST POINT

14   THAT WAS MADE BY COUNSEL IN TALKING ABOUT POTENTIAL

15   HARM.

16               THERE HASN'T EVEN BEEN A SHOWING FOR

17   POTENTIAL HARM HERE.  THERE IS NOTHING UNIQUE ABOUT

18   THOUSAND TRAILS' CUSTOMERS.  THERE IS NOTHING SO

19   SENSITIVE ABOUT THOUSAND TRAILS CUSTOMERS THAT'S

20   DIFFERENT FROM EMPLOYEES, FOR EXAMPLE IN THE SEDANO

21   CASE.  WE ARE TALKING ABOUT EMPLOYEES OF A DRUG

22   STORE COMPANY, RITE-AID.

23               THERE'S NO REASON TO BELIEVE THAT US

24   SAYING THERE IS A LAWSUIT WHICH FRANKLY IS PUBLIC

25   RECORD ANYWAY.

1          THE COURT:  WE ARE HERE IN OPEN COURT

2     AFTER ALL, RIGHT.

3          MR. SHENKMAN:  EXACTLY.

4          THERE'S NO REASON TO BELIEVE THAT THAT

5     WOULD HAVE A DIFFERENT EFFECT ON THEIR CUSTOMERS

6     THAN IT WOULD A CONTAMINATION EFFECT THAN IT WOULD

7     ON EMPLOYEES OF RITE-AID.

8          THE NEXT POINT I WOULD LIKE TO MAKE IS I

9     THINK THIS IS PUTTING THE CART BEFORE THE HORSE TO

10    TALK ABOUT CLASS CERTIFICATION.

11          YOU KNOW, COUNSEL TALKS ABOUT THAT WE

12    HAVEN'T GIVEN OUR DEPOSITIONS OF OUR CLIENTS.  WE

13    WOULD BE HAPPY TO.  BUT THE FACT IS WE DIDN'T GET

14    ANY DOCUMENTS FROM THE DEFENDANTS UNTIL FRIDAY AND

15    WE HAVEN'T HAD AN OPPORTUNITY TO LOOK AT THOSE

16    DOCUMENTS.  SO IT'S DIFFICULT TO MAKE A WHOLE LOT

17    OF ARGUMENTS ABOUT CLASS CERTIFICATION WITH

18    ABSOLUTELY NO DISCOVERY UP TO THIS POINT.

19          BUT YOU KNOW, ONE THING THAT COUNSEL'S

20    ARGUMENTS IGNORE IS THAT THOUSAND TRAILS, ONE OF

21    THEIR CORPORATE ENTITIES THAT THEY TOOK OVER THE

22    NACO MEMBERSHIPS.

23          AND THEY HAVE, FOR EXAMPLE, THE

24    CALIFORNIA CAMPGROUND CONSTITUTE THEY HAVE A DUTY

25    TO PROVIDE ANNUAL DISCLOSURES.  SO IT DOESN'T

34

1    MATTER WHEN THE FESKE'S PURCHASED THEIR MEMBERSHIP.

2    THEY HAVE AN OBLIGATION EVERY YEAR TO PROVIDE

3    DISCLOSURES TO THE FESKE'S AND EVERY ONE OF THEIR

4    OTHER MEMBERS.

5              AND THAT'S WHAT THEY DIDN'T DO HERE.

6    THAT'S AT ISSUE.

7              THE COURT:  THIS ALL SOUNDS LIKE WE ARE

8    WELL INTO THE ISSUES OF THE MERITS FOR THE MOTION

9    FOR CLASS CERT.

10             ARE THERE ANY FINAL POINTS YOU WISH TO

11   MAKE ON THIS LIMITED DISCOVERY ISSUE?

12             MR. SHENKMAN:  YES.

13             I THINK ONE OF THE FIRST THINGS THAT THIS

14   COURT SAID IN ITS APRIL 3RD ORDER WAS THE CLASS

15   CERTIFICATION MOTION WAS DUE IN AUGUST.

16             I BELIEVE THIS DISCOVERY THAT WE ARE

17   TALKING ABOUT NOW WAS SERVED IN DECEMBER.

18             THE COURT:  AND IT WAS ORDERED PRODUCED

19   IN APRIL.

20             MR. SHENKMAN:  RIGHT.

21             AND SO THE PROCEDURE THAT DEFENDANTS ARE

22   PROPOSING HERE WOULD JUST RESULT IN FURTHER DELAY

23   WELL BEYOND THAT AUGUST DATE.

24             THEY TALK ABOUT WE WILL GIVE THEM 60 AND

25   THEN IF THE RESPONSE RATE IS THIS THEN WE WILL GIVE

35

1    THEM MORE.

2              I MEAN, THIS IS, WE ARE NOW TALKING ABOUT

3    MONTHS.

4              AND FURTHER, IF THE COMMUNICATIONS ARE

5    LIMITED TO JUST WRITTEN COMMUNICATIONS, THEN

6    THERE'S NO OPPORTUNITY FOR FOLLOWUP QUESTIONS.  OR

7    IF THERE IS, IT'S MONTHS DOWN THE ROAD.

8              AND IT'S TIME TO JUST GET THIS

9    INFORMATION, IF WE ARE WRONG ABOUT CLASS

10   CERTIFICATION AS DEFENDANTS SEEM TO THINK WE ARE,

11   THEN SO BE IT.  BUT LET'S GET THE INFORMATION IN

12   FRONT OF THE COURT.

13             THE COURT:  ALL RIGHT.

14             THANK YOU VERY MUCH.

15             MATTERS ARE SUBMITTED.  YOU WILL HAVE

16   ORDERS FROM ME AS SOON AS I CAN GET THEM OUT.

17             THANK YOU ALL.

18   (WHEREUPON, THE PROCEEDINGS IN THIS MATTER WERE

19   CONCLUDED.)

20

21

22

23

24

25

                                                      36

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23            /S/
              _____
24            SUMMER A. FISHER, CSR, CRR
              CERTIFICATE NUMBER 13185
25