JENNER & BLOCK LLP
David J. Bradford (*pro hac vice*)
Michael T. Brody (*pro hac vice*)
353 N. Clark St.
Chicago, Illinois 60654
Telephone: (312) 222-9350
Fax: (312) 840-7711

Jean M. Doherty (Cal. Bar No. 264308)
633 West 5th Street, Suite 3600
Los Angeles, California 90071
Telephone: (213) 239-5100
Fax: (213) 239-5182

Counsel for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### (SAN JOSE DIVISION)

| | |
|---|---|
| **DAVID FESKE and TERI FESKE, individually and on behalf of Class Members,**<br><br>Plaintiffs,<br><br>v.<br><br>**MHC THOUSAND TRAILS LIMITED PARTNERSHIP, MHC OPERATING LIMITED PARTNERSHIP, EQUITY LIFESTYLE PROPERTIES, INC., a Maryland corporation; THOUSAND TRAILS MANAGEMENT SERVICES, INC., a Nevada corporation, and Does 1-100, inclusive,**<br><br>Defendants. | Case No. 11-04124 (PSG)<br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DENY CLASS CERTIFICATION**<br><br>Hearing date: August 28, 2012<br>Time: 10:00 a.m.<br>Courtroom: 5<br>Judge: Hon. Paul S. Grewal<br><br>Action Filed: July 24, 2011<br>Trial Date: Not set |

1

## TABLE OF CONTENTS

2

INTRODUCTION...................................................................................................................... 1

3

BACKGROUND........................................................................................................................ 3

4

      A.    Plaintiffs Allege Uniform Misrepresentations And Pursue Class-Wide

5

            Discovery. ............................................................................................................ 3

6

      B.    Documents Produced on Plaintiffs' Behalf Purportedly To Support

7

            Plaintiffs' Allegations. ........................................................................................ 3

8

      C.    The Feskes' Depositions Reveal The Falsity of The Complaint and

            Demand Letter....................................................................................................... 4

9

      D.    The Feskes' Depositions Reveal Plaintiffs' Counsel Manipulated The

10

            Document Production............................................................................................. 6

11

      E.    Unsuccessful Efforts to Resolve The Real Source Of Documents Counsel

            Produced on The Feskes' Behalf........................................................................... 8

12

CLASS CERTIFICATION SHOULD BE DENIED ................................................................. 9

13

I.       The Court Should Address Certification On Defendants' Motion....................................... 9

14

II.      Class Certification Should Be Denied When Class Counsel Are Inadequate................... 10

15

      A.    Class Certification Should Be Denied Where Class Counsel Fail To

16

            Investigate Adequately the Claims of the Purported Class Representative. ......... 10

17

      B.    In This Case, Class Counsel And The Class Representatives Are Not

18

            Adequate............................................................................................................... 13

19

III.    Class Certification Should Be Denied Because The Plaintiffs Concede Their

       Claims Are Not Typical Of The Claims Of The Class And Plaintiffs Cannot

20

       Adequately Represent the Class. ..................................................................................... 21

21

CONCLUSION ........................................................................................................................ 24

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**CASES**                                                                                                                    **PAGE(S)**

*Armour v. Network Assoc., Inc.,*
   171 F. Supp. 2d 1044 (N.D. Cal. 2001) ................................................................................. 21

*Ballan v. Upjohn,*
   159 F.R.D. 473 (W.D. Mich. 1994) ......................................................................... 10, 11, 20

*Beck v. Status Game Corp.,*
   1995 U.S Lexis 9978 (S.D.N.Y. July 13, 1995) ..................................................................... 21

*Broussard v. Meineke Discount Muffler Shops, Inc.,*
   155 F.3d 331 (4th Cir. 1998) ................................................................................................. 23

*Byes v. Telecheck Recovery Servs., Inc.,*
   173 F.R.D. 421 (E.D. La. 1997) .................................................................................... 11, 20

*Doninger v. Pac. Nw. Bell, Inc.,*
   564 F.2d 1304 (9th Cir. 1977) ................................................................................................. 9

*Evans v. IAC/Interactive Corp.,*
   244 F.R.D. 568 (C.D. Cal. 2007) ..................................................................................... 10, 20

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.,*
   270 F.R.D. 150 (S.D.N.Y. 2010) ........................................................................................... 12

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.,*
   270 F.R.D. 150 (S.D.N.Y. 2010) ........................................................................................... 12

*Gen. Tel. Co. v. Falcon,*
   457 U.S. 147 (1982) .................................................................................................... 23, 24

*Glasser v. Volkswagen Of America, Inc.,*
   645 F.3d 1084 (9th 2011) ...................................................................................................... 12

*Harris v. Vector Marketing Corp.,*
   2010 WL 3743532 (N.D. Cal. Apr. 27, 2012) ....................................................................... 12

*Heisler v. Maxtor Corp.,*
   2010 WL 4788207 (N.D. Cal. Nov. 17, 2010) ...................................................................... 24

*In re Quintus Sec. Litig.,*
   148 F. Supp. 2d 967 (N.D. Cal. 2001) ................................................................................. 21

*In re Rhone Poulenc Rorer,*
   51 F.3d 1293,1299 (7th Cir. 1995) ......................................................................................... 9

*Kaplan v. Pomerantz,*
   132 F.R.D. 504 (N.D. Ill. 1990) .......................................................................................... 12

ii

*Kay v. Wells Fargo & Co.,*
   247 F.R.D. 572 (N.D. Cal. 2007) ................................................................................. 12

*Kelley v. Mid-Am. Racing Stables, Inc.,*
   139 F.R.D. 405 (W.D. Okla. 1990) ............................................................................... 21

*Legge v. Nextel Commc'ns, Inc.,*
   2004 WL 5235587 (C.D. Cal. 2004) ............................................................................... 9

*Perry-Roman v. AIG Retirement Servs., Inc.,*
   2010 WL 8697061 (C.D. Cal. 2010) ............................................................................... 8

*Red v. Kraft Foods, Inc.,*
   No. 10-1028, 2011 WL 4599833 (C.D. Cal. September 29, 2011) .................................. 21

*Sipper v. Capital One Bank,*
   2002 WL 398769 (C.D. Cal. 2002) ............................................................................... 10

*Stanley v. Bayer Healthcare LLC,*
   2011 WL 5569761 (S.D. Cal. 2011) ............................................................................. 21

*Sweet v. Pfizer,*
   232 F.R.D. 360 (C.D. Cal. 2005) .................................................................................. 10

*Thorogood v. Sears Roebuck Co.,*
   547 F.3d 742 (7th Cir. 2008) .......................................................................................... 9

*Trzeciak v. Apple Computers, Inc.,*
   1995 WL 20329 (S.D.N.Y. 1995) ................................................................................. 18

*Twombly v. Bell Atlantic Co.,*
   550 U.S 544 (2007) .................................................................................................. 9, 10

*Vinole v. Countrywide Home Loans, Inc.,*
   571 F.3d 935 (9th Cir. 2009) ...................................................................................... 8, 9

*Wal-Mart v. Dukes,*
   180 L. Ed. 2d 374 ........................................................................................................ 21

*Wang v. Chinese Daily News, Inc.,*
   231 F.R.D. 602 (C.D. Cal. 2005) .................................................................................. 10

*Wiener v. Dannon Co.,*
   255 F.R.D. 658 (C.D. Cal. 2009) .................................................................................. 23

*Williams v. Balcor Pension Investors,*
   150 F.R.D. 109 (N.D. Ill. 1993) ................................................................................... 11

*Wrighten v. Metropolitan Hosps. Inc.,*
   726 F.2d 1346 (9th Cir. 1984) ...................................................................................... 21

1

**OTHER AUTHORITIES**

2

7A Wright & Miller § 1766 (2d Ed. 1986) .................................................................................. 21

3

Federal Rule of Civil Procedure 23(a)(3)..................................................................................... 23

4

Federal Rule of Civil Procedure 23(a)(4)..................................................................................... 10

5

Federal Rule of Civil Procedure 23(c)(1)(A) ............................................................................ 8, 9

6

Federal Rule of Civil Procedure 23(f)............................................................................................ 9

7

Federal Rule of Civil Procedure 26(b)(1) .................................................................................... 18

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 11-04124 (PSG)                                    Motion to Deny Class Certification

1

**INTRODUCTION**

2      Both the Complaint in this case and the pre-suit demand letter, which is the centerpiece of

3  Plaintiff's claim for rescission on behalf of 100,000 campground members, are riddled with

4  admittedly false statements.  The letter, signed by the Feskes but written by counsel, asserts that

5  the Feskes acted based on uniform representations of the Defendants that the camping programs

6  were exclusive, and the Feskes were surprised to experience overcrowding at Defendants'

7  campgrounds due to the presence of public campers.  It also complains about Defendants' "zone"

8  camping program.   The letter was false.  The Feskes have admitted they were never promised

9  that the campgrounds were exclusive, they never experienced overcrowding or observed public

10  campers, they did not belong to or consider joining the "zone" camping program, and they never

11  received or relied upon uniform documents.

12      The Complaint alleges the same fabricated story as the demand letter.  The Complaint

13  alleges misrepresentations about the campground program were made to the Feskes and the

14  class.  The Complaint alleged common misrepresentations about public camping, a money-back

15  guaranty upon cancellation, and other program benefits.  The Complaint was false.  The Feskes

16  have now conceded they never received those so-called common representations.

17      Counsel purported to attach to the Complaint various  allegedly uniform "form

18  documents," specifically a "common" disclosure statement and campground membership

19  agreement.  But the exhibits were never attached.  The Complaint alleges these common

20  documents were given to all members of the class.  Counsel included the purported "common

21  documents" — along with others that were obtained from unknown sources and which were also

22  referenced in the Complaint or demand letter — into the Feskes' document production, thereby

23  creating the illusion that the documents belonged to the Feskes and that the Feskes had relied

24  upon the common documents and statements made in them.  Counsel then exploited these false

25  allegations in the complaint to initiate broad, class-wide discovery, and obtained tens of

26  thousands of documents concerning alleged class claims that the Feskes do not possess.

27      When the Feskes were deposed, this charade was exposed.  The Feskes confirmed they

28  inherited their membership interest from Mr. Feskes' mother and they never received any of the

1    purported "common" documents, including those that were referenced in the Complaint. They

2    did not even recognize the purported common documents that were referenced in their

3    Complaint and produced on their behalf. The Feskes also confirmed they never relied upon these

4    documents or other alleged class-wide documents. They acknowledged that they had never

5    relied on any representations from Defendants about public camping or a money-back guaranty.

6    The depositions made clear that the claims alleged in their name in the Complaint had no good

7    faith basis.

8       Counsel has refused to explain how documents unknown to the Feskes ended up in their

9    production. Defendants' counsel asked Plaintiffs' counsel to confirm that the documents

10    Plaintiffs produced had not been added by counsel. Counsel refused to "make any

11    representations with respect to that issue" and told Defendants' counsel to "take it up with the

12    court." Counsel never attached any of the identified exhibits to the Complaint — although the

13    Complaint falsely alleged form documents were attached as exhibits and gave the impression the

14    Feskes had received these documents. After being repeatedly pressed to identify the exhibits to

15    the Complaint, counsel could produce only the same documents that the Feskes admitted they

16    had never seen.

17       The following points cannot be disputed or altered through further discovery, and warrant

18    denial of certification without delay: The demand letter and Complaint are false at their core.

19    The Feskes do not have class claims. The Feskes' counsel have either knowingly presented this

20    Court with a false story, or their pre-filing investigation was incompetent. Plaintiffs' counsel

21    have exploited this concocted story to obtain extensive discovery to which the Plaintiffs were not

22    entitled. In these circumstances, neither the Feskes nor their counsel can adequately represent

23    the class. Only by denying certification now can defendants be spared the further delay,

24    discovery, and expense that will result each day this case is permitted to continue as a class

25    claim.

26

27

28

**BACKGROUND**

**A.    Plaintiffs Allege Uniform Misrepresentations And Pursue Class-Wide Discovery.**

Plaintiffs filed this putative class action lawsuit, alleging violation of Nevada, California, Texas, Florida, and Arizona campground membership laws, as well as fraud, negligent misrepresentation, unjust enrichment, and violation of the Business and Professions Code. (Compl., Counts I-XI).  Woven throughout the Complaint are references to alleged misrepresentations Defendants are said to have made on their website and in their marketing materials. *See, e.g.*, Compl. ¶ 68 (alleging that Defendants made "statements that currently appear on their website, implying that Thousand Trails campgrounds are 'exclusive' or open to only 'lifetime members [and purchasers of] the Zone Camping Pass,' or that only a small subset of the Thousand Trails campgrounds were available for use by non-members").  The Complaint complains of the ability of non-members to use program campgrounds for public camping; Plaintiffs' inability to use a particular campground and to know what benefits their program included; and that a money-back cancellation promise was not honored.

Plaintiffs' counsel initiated broad discovery in support of Plaintiffs' class-wide claims. To date, they have obtained tens of thousands of pages of documents — including the contract forms and disclosures used with defendants' customers — even though those documents were not used with plaintiffs and the legacy program in which plaintiffs formerly were members. Declaration of David J. Bradford (Bradford Decl. ¶ 7.)  In addition, defendants have produced approximately 60,000 pages of website materials (*id.*) based on allegations that the Feskes relied upon statements made on the website — which the Feskes now admit they never did.

**B.    Documents Produced on Plaintiffs' Behalf Purportedly To Support Plaintiffs' Allegations**.

Plaintiffs produced 117 pages of documents in response to Defendants' requests for production of documents.  Fifty of those pages were two copies of a campground directory. Bradford Decl. ¶ 2.  Among the produced documents were several screenshots printed from Defendants' website.  Ex. F.[1]  The production of the website screenshots appeared to corroborate the Complaint's allegations that Plaintiffs relied on the website in making decisions about the

[1] "Ex." refers to exhibits attached to the Declaration of David J. Bradford.

program.  In addition, plaintiffs produced a standard disclosure statement, a standard Zone Park Pass membership agreement, and "Zone Park Pass" program rules.  Exs. D, E, G.

Plaintiffs also produced an undated letter to Defendants, signed by David and Teri Feske (the "demand letter") complaining about the programs.  Ex. B.  The letter purports to describe the Feskes' experiences with the program, including purported dissatisfaction with seeing public campers crowding a campground the Feskes had the right under their membership to use. *Id.*  In their Complaint, the Feskes alleged this demand letter gave the notice required by the California campground statute for all 100,000 putative class members. *See* Compl. ¶ 35.

**C.    The Feskes' Depositions Reveal The Falsity of The Complaint and Demand Letter.**

On June 25, 2012, Plaintiffs Teri and David Feske were deposed.  Bradford Decl. ¶ 3. The Feskes confirmed they had not seen the Complaint prior to the Friday before the deposition, and that their attorney had prepared the demand letter for them to sign — using Feske letterhead that the Feskes had never seen. *See* Ex. I at 75:9-24, 146:19-147:21; Ex. J at 62:4-63:3, 39:8-10; 34:25-35:12.

The Feskes testified that many of the allegations in the Complaint, and statements made in the demand letter, were false.  Here are a few examples:

- The Complaint alleges the Feskes were "promised" certain campgrounds would be available only to members and their guests (Compl. ¶ 14); yet the Feskes confirmed they had been promised no such thing.  Ex. I at 90:22-91:3; Ex. J. at 47:18-48:14; 35:14-36:3; 24:1-10.

- The Feskes stated in the demand letter that the Feskes had seen public campers crowding their campground.  Ex. B.  Those statements were false.  The Feskes had never noticed public campers, and the only campground they ever visited had not been crowded. *E.g.* Ex. I at 149:7-151:23; 151:25-152:6; Ex. J at 36:4-37:11.

- The demand letter complains that the Feskes could not use the Las Vegas campground which they believed was in the Southwest Zone (Ex. B); in their depositions it became clear that neither of them believed they were members of the southwest zone because they did not even know what the southwest zone was. Ex. I at 152:7-153:11; 183:2-4; *see also* Ex. J. at 37:12-21.  David Feske

-4-

confirmed he did not "ever understand [him]self to have a zone membership pass" or even that there "was such a thing as a zone membership pass." Ex. I. at 152:19-153:2.  Nor had he even considered joining the Zone Pass program.  Ex. I. at 183:2-4.

- The complaint alleges that the Feskes were induced to acquire a campground membership in 2002 by the promise of a money-back guaranty (Compl. ¶¶ 13, 67); but the Feskes recalled no such promise. (*E.g.* Ex. I at 89:25-90:12; Ex. J at 20:22-21:1; 21:2-5; 60:5-61:13.)  In fact, the only mention of a money-back guaranty that the Feskes recalled in their depositions was Mrs. Feske's statement that her "general understanding" of the website, which she reviewed more recently, led her to believe Thousand Trails offered a money-back guaranty. *See also* Ex. J at 103:13-20 (Mrs. Feske believed there was a money-back guaranty not because of any specific language she saw, but based on her "general understanding" of the website as a whole).  However, the Thousand Trails website was not in existence in 2002 when the Feskes became members, and it offers a 30 day guaranty only to those who purchase through the website, which the Feskes did not.  The Feskes confirmed that no other source led them to believe Thousand Trails offered a money-back guaranty in 2002 – Mrs. Feske testified she had never spoken to a Thousand Trails representative (Ex. J at 85:14-21) except possibly on one occasion to obtain reservations in Las Vegas (Ex. J. at 20:12-17).  Mr. Feske could not recall being offered a money-back guaranty at all. *E.g.*, Ex. I at 89:25-90:12.

Plaintiffs persisted in these claims.  In the case management statement, for example, they repeated the claim that "defendants promised plaintiffs that if they were not satisfied with their campground membership, the money they paid for that membership would be refunded" and promised the "use and enjoyment of certain campgrounds and portions of the other campgrounds would be limited to members and their guests."  Plaintiffs claimed that they "and other members

1  reasonably relied on those false promises and representations" and that reliance "may be

2  presumed class-wide." Plaintiffs' Case Management Statement, filed October 5, 2011, at 3.

3          The Feskes' testimony completely refutes the claim that Defendants made common

4  misrepresentations to the class, including the Feskes. As part of Plaintiffs' effort to allege

5  common practices, the Complaint alleged the Feskes had received or relied on common

6  documents that were used with the entire class. The Complaint purported to attach as exhibits to

7  the Complaint the common documents on which the class allegations were based. Compl. ¶ 12.

8  But no exhibits were attached. The Feskes testified that they could not recall having seen any of

9  the so-called common disclosures. *E.g.* Ex. I at 181:22-183:4; Ex. J. at 44:4-17 (disclosure

10 statement produced by Plaintiffs (Ex. E)); Ex. I at 224:4-11; 256:6-8; Ex. J at 85:22-86:16

11 (disclosure statement produced by defendants, marked as Ex. 4 in the Feskes' depositions (Ex.

12 O)); Ex. I. at 178:24-181:21; Ex. J at 43:15-44:3 (Zone Park Pass membership agreement

13 produced by plaintiffs (Ex. D)). Further, in response to repeated demands and threat of motion

14 practice, plaintiffs' counsel belatedly identified the documents they assert were the exhibits to

15 the Complaint. The "exhibits" were the same documents (Exs. E and D) that the Feskes admitted

16 at their depositions they had not seen prior to the Friday before their depositions when they met

17 with counsel to prepare. *Compare id.* and Exs. E, D *with* Bradford Decl. ¶ 5 and Exs. L, M.

18         Defendants have prepared a table, attached as Exhibit K to the declaration of David

19 Bradford summarizing the numerous instances in which the testimony of the Feskes is

20 inconsistent with the statements in the demand letter and Complaint.

21 **D.     The Feskes' Depositions Reveal Plaintiffs' Counsel Manipulated The Document
         Production.**

22         The Feskes' testimony further revealed that many of the documents they produced had

23 nothing to do with their experience, but were sourced elsewhere and were added to the

24 production. Defendants' counsel asked the Feskes about documents that had been produced on

25 their behalf. The Feskes were unfamiliar with many of those documents. As to others, the

26 Feskes testified that they had seen them for the first time the Friday before the deposition when

27 they met with counsel to prepare. For example, the Feskes did not recognize the "uniform"

28 disclosure statement or membership agreement (Exs. E and D) that counsel produced on their

behald. *E.g.*, Ex. I at 89:1-8, 181:22-183:4; Ex. J at 44:4-17 (disclosure statement (Ex. E)); Ex. I at 178:15-181:21; Ex. J at 43:10-44:3) (membership agreement (Ex. D)).

The Feskes' testimony that they were not familiar with the "common" representations confirmed that the demand letter and Complaint were false.  Indeed, because the Feskes inherited their membership, they did not receive any of the "common" disclosure documents that new members receive when they join a program for the first time.  *See* Exs. A, C, H (documents relating to the membership transfer); *see also* Ex. I at 21:17-26:22 (D. Feske discussing his decision to keep his mother's "membership . . . going" after she passed away); *id.* at 181:22-183:4, Ex. J. at 44:4-17 (the Feskes did not recall receiving "form" disclosure statements they produced); Ex. I at 224:4-11; 256:6-8; Ex. J at 85:22-86:16 (they did not recall receiving "form" disclosure statement (Ex. O) produced by defendants, marked as Ex. 4 in the Feskes' depositions; *see also* Ex. I at 85:24-87:11; 21:17-26:22; Ex. J at 70:19-71:8 (the membership agreement the Feskes' signed was the transfer agreement that gave them ownership of Mr. Feske's mother's membership (Ex. A).

Because they inherited Mr. Feskes' parents' NACO West membership, the Feskes did not receive the "common" "Zone Park Pass" membership agreement (Ex. D) that counsel claim they intended to attach to the Complaint, and did not recognize the Zone Park Pass rules (Ex. G), which was deceptively included as part of their production.  Ex. I at 178:15-181:21; Ex. J. at 43:10-44:3 (the Feskes did not recall receiving the "form" Zone Park Pass membership agreement);  Ex. I at 200:18-201:21; Ex. J at 49:9-19 (the Feskes did not recall seeing the Zone Park Pass Rules (Ex. G), produced as Feske 74-85).  That is because the Feskes are not members of a Zone Park Pass program, which is a newer program Defendants now offer.  When Defendants' counsel asked why the Plaintiffs mentioned the Southwest Zone in their "demand letter," the Plaintiffs confirmed that counsel helped prepare the letter and that Plaintiffs did not even know what the Southwest Zone was.  *See, e.g.*, Ex. I at 146:19-147:21; 152:7-153:11; Ex. J. at 37:12-21; 34:25-35:12.

**E.    Unsuccessful Efforts to Resolve The Real Source Of Documents Counsel Produced on The Feskes' Behalf.**

During the depositions, Defendants' counsel asked counsel for Plaintiffs to confirm that the produced documents actually had been in the Feskes' custody and control and were part of their production. (Ex. I at 195:16-197:2). When counsel responded only that, "It's been produced," Defendants' counsel clarified: "Are you representing that this is exclusively [the Feskes'] documents?" *Id.* at 197:3-5. Plaintiffs' counsel refused to answer that simple question, asserting "I'm not going to make any representation at all in that respect." *Id.* at 197:6-7. Defendants' counsel repeatedly asked for clarification and repeatedly explained why the information was important:

> I'm asking for what documents were in the witness's files. I don't
> believe that you've produced what documents were in the
> witness's files on . . . an identifiable basis. We've received a
> number of documents, some of them duplicative and not all of
> which were apparently in the witness's possession, which makes it
> impossible to determine what the witness had and didn't have . . .
> So I'd ask you to produce whatever the witness has . . . on a stand-
> alone basis . . . I have questions related to what documents the
> witness had, which I'm unable to ask because we get to the
> deposition and learn for the first time that you haven't produced
> the witness's documents on a stand-alone basis so that they're
> identifiable.

*Id.* at 197:23-198:24. When Plaintiffs' counsel again refused, Defendants' counsel clarified yet again: "I'm asking, on the record, whether you have produced a set of the documents that were in the witness's possession without including in those documents, documents that were not in the witness's possession." *Id.* at 199:17-21. Again, Mr. Shenkman refused to disclose where the documents came from, and told Defendants' counsel to "take it up with the court." *Id.* at 200:13-17.[2]

---

[2] Defendants followed up with two emails requesting identification of the production, and providing authority for their entitlement to the information about the custody and origin of the documents produced. Plaintiffs' counsel ignored these requests. (Bradford Decl. ¶ 4 and Ex. L.) Plaintiffs' counsel have had ample opportunity to provide an explanation, if one exists.

**CLASS CERTIFICATION SHOULD BE DENIED**

**I.     The Court Should Address Certification On Defendants' Motion.**

Rule 23 directs that class certification be decided "at an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). The Court does not need to wait until the plaintiffs move for class certification. "District courts throughout the nation have considered defendants' 'preemptive' motions to deny certification." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939-40 (9th Cir. 2009) (affirming denial of class certification); *Perry-Roman v. AIG Retirement Servs., Inc.*, 2010 WL 8697061, at *2 (C.D. Cal. 2010) (granting defendants "preemptive' motion" to deny class certification, and noting it "is not precluded by Rule 23"). "Nothing in the plain language of Rule 23(c)(1)(A) either vests plaintiffs with the exclusive right to put the class certification issue before the district court or prohibits a defendant from seeking early resolution of the class certification question." *Vinole*, 571 F.3d at 939-40.

It is important for district courts to rule that a case may not proceed as a class action as soon as the court may make that determination. *See, e.g., Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977) (in light of Rule 23's requirement that the court rule on the propriety of class certification expeditiously, it is proper to deny class certification without allowing classwide discovery where "plaintiffs fail to make even a prima facie showing of Rule 23's prerequisites"). The pendency of a case as a class action distorts the parties' approach to the case. *In re Rhone Poulenc Rorer*, 51 F.3d 1293,1299 (7th Cir. 1995); *Legge v. Nextel Commc'ns, Inc.*, 2004 WL 5235587, at *13 (C.D. Cal. 2004) ("Allowing this case to proceed as a class action has potentially ruinous results — without concomitant benefit to the class," reasoning that "[c]ourts bear a significant responsibility to insure that the great power wielded by plaintiffs (or more accurately their counsel) carrying the cudgel of a class action is used only in appropriate cases"). Even an unfounded class action may over-deter, and cause parties who behaved entirely properly to look for a way to resolve, rather than litigate, the case. *Thorogood v. Sears Roebuck Co.*, 547 F.3d 742, 745 (7th Cir. 2008); *see Legge*, 2004 WL 5235586, at *13 ("An order granting certification . . . may force a defendant to settle rather than incur the costs of defending a class action") (quoting Fed. R. Civ. P. 23(f) Adv. Comm. Notes); *cf. Doninger*, 564 F.2d at 1313.

1    Forcing defendants to continue to shoulder the burden and expense of continuing

2   litigation is improper where there is no chance that plaintiffs will recover. *See Bell Atl. Co. v*

3   *Twombly*, 550 U.S 544, 557-60 (2007). In *Twombly*, the Supreme Court emphasized the

4   important role the district court plays in deciding pre-trial motions. The Supreme Court made

5   clear that district courts should grant motions to dismiss, where appropriate, rather than permit

6   the parties to conduct discovery. The discovery process is expensive and burdensome –

7   defendants should not be put to that burden unnecessarily. *Twombly* provides that the court

8   should address dispositive issues early to eliminate the continuing burden. The same is true in

9   this case. As Rule 23 makes clear, class certification should be decided at this early practicable

10   time, so that defendants may be spared the costs that result from groundless putative class

11   proceedings.

12   **II.    Class Certification Should Be Denied When Class Counsel Are Inadequate.**

13       **A.    Class Certification Should Be Denied Where Class Counsel Fail To Investigate Adequately the Claims of the Purported Class Representative.**

14       Rule 23(a)(4) holds class counsel and class representatives to a high standard. Class

15   counsel must be diligent, adequate, and fulfill their fiduciary obligations to the class. *See, e.g.,*

16   *Sweet v. Pfizer*, 232 F.R.D. 360, 366, 370 (C.D. Cal. 2005); *see also Sipper v. Capital One*

17   *Bank*, 2002 WL 398769, at *3-5 (C.D. Cal. 2002). Where counsel have failed to conduct a

18   proper pre-filing investigation, with the result being that counsel have filed demonstrably false

19   claims, counsel is inadequate, warranting denial of certification. *See, e.g., Evans v.*

20   *IAC/Interactive Corp.*, 244 F.R.D. 568, 578-580 (C.D. Cal. 2007) (counsel was deemed

21   inadequate by virtue of having submitted false statements from class representative); *Ballan v.*

22   *Upjohn*, 159 F.R.D. 473, 492 (W.D. Mich. 1994) (counsel deemed inadequate due to deficient

23   pre-filing investigation).

24       In *Evans*, counsel's submission of false statements from the class representatives caused

25   the court to find counsel to be inadequate. Counsel submitted false statements in a declaration

26   obtained from a class representative. The Court found "discrepancies between the declarations

27   and depositions are certainly troubling, and . . . raise significant questions about the competence,

28   if not the integrity, of the Plaintiffs and their counsel. These discrepancies might well cause a

1  fact finder to 'focus on [Plaintiffs'] credibility to the detriment of the absent class members'

2  claims.'" *Id.* at 578, *citing Wang v. Chinese Daily News, Inc.,* 231 F.R.D. 602, 609-10 (C.D.

3  Cal. 2005). The court concluded, "in all actions — but in class actions especially — it is critical

4  that the Court be able to rely on the accuracy of evidentiary submissions obviously and

5  necessarily drafted by counsel. Counsel's lax approach to the preparation of declarations in a

6  case where they seek to represent hundreds of thousands of people and seek millions of dollars is

7  simply unacceptable." 244 F.R.D. at 579.

8       Other courts have also found to conduct a sufficient pre-filing investigation of the class

9  representative claims renders counsel inadequate in that case. In *Ballan v. Upjohn*, 159 F.R.D.

10 473, 492 (W.D. Mich. 1994), for example, counsel failed to make a reasonable pre-filing

11 investigation of proposed representatives. The court found counsel inadequate, concluding that

12 "I cannot find [plaintiff's counsel] adequately fulfilled" their fiduciary "duty in light of their

13 hasty and inadequate attempt to amend the class period." The court denied class certification

14 where "[p]laintiff's counsel inexcusably bollixed their selection of class representatives."

15 *Ballan*, 159 F.R.D. at 488. The court found "this failure to make a reasonable pre-filing

16 investigation of proposed class representatives is sufficient to find counsel inadequate." *Id.* at

17 489.

18      Likewise, in *Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 119-120 (N.D. Ill.

19 1993), the court found counsel inadequate because their "investigation of the proposed class

20 representatives was woefully inadequate." The law firm should have known, for example, that

21 one representative had not read the prospectus that contains the alleged misrepresentations and

22 omissions on which this suit is based. The court observed:

23      When an attack on the class representatives is made, the court may weigh (and, in
       this case, the defendants ask us to weigh) not only the adequacy of class
24      representatives but, if they are inadequate even under loose standards, whether the
       action of potential class counsel in selecting them creates some doubt about
25      counsel's ability to serve as lead counsel in this suit. If we recognize that counsel
       have a lot to do with assembling the elements of a class action law suit, including
26      finding plaintiffs, then class counsel ought to do a good job of it.

27 *Balcor*, 150 F.R.D. at 118–19. The reasoning of the *Balcor* case applies with full force here. For

28 example, counsel should have known that the Feskes did not join a campground membership

program based on any common disclosures or representations. The Feskes inherited their

-11-

1  membership, as was obvious from the fact that the Feskes produced documents showing the

2  transfer of membership from Mr. Feske's parents. There was no evidence that the Feskes had

3  purchased their membership from defendants. Moreover, a quick review of the documents

4  showed the Feskes were not members of the Zone Park Pass program, and allegations and

5  documents pertaining to that program had nothing to do with their claims.

6       Similarly, in *Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421, 427 (E.D. La.

7  1997), the court denied class certification where, *inter alia*, a false affidavit had been submitted

8  on behalf of the class plaintiff. The court explained: "Given [plaintiff's] limited understanding

9  about these proceedings, the court finds it unlikely that she intentionally submitted a false

10  affidavit and more likely that she signed the affidavit at the behest of her attorneys without

11  understanding the significance of doing so. The affidavit indicates to the court that [the plaintiff]

12  places blind reliance on her attorneys, but even more so, it reflects poorly on the adequacy of

13  counsel." *See also Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (conduct of

14  plaintiff's lawyers during a deposition convinced the Court that plaintiff's counsel was a silent

15  accomplice in, or encouraged, plaintiff's false testimony, such that the adequacy of

16  representation prong of Rule 23 was not satisfied and decertification was warranted); *Friedman-*

17  *Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 160 (S.D.N.Y. 2010) (class counsel were

18  inadequate where they "were complicit in the misrepresentations made by the Plaintiff during her

19  deposition and in response to her interrogatories" and "at the least . . . allowed false testimony to

20  be given; while at the worst, the testimony was actually encouraged and counseled"). [3]

21

22  [3] Counsel also owe fiduciary duties to the class, including the duty to act vigorously and with
23  integrity on behalf of the class. *See, e.g., Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 578 (N.D.
    Cal. 2007) (to "adequately represent a class" counsel must "act vigorously on behalf of" the class
24  members); *Glasser v. Volkswagen Of America, Inc.*, 645 F.3d 1084, 1088 (9th 2011) ("[i]n this
    scenario, class counsel have breached their fiduciary duty to the class"); *Harris v. Vector*
25  *Marketing Corp.*, 2010 WL 3743532, at *4 (N.D. Cal. Apr. 27, 2012) (class counsel "owe a
    fiduciary duty not to prejudice" the interests of putative class members); *accord Friedman-Katz*
26  *v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 160 (S.D.N.Y. 2010) ("in considering whether
    the proposed class counsels are adequate, the Court may consider the honesty and integrity of the
27  putative class counsels, as they will stand in a fiduciary relationship with the class").

28

As shown in the following section, in light of the standards, class counsel and the proposed class representatives cannot meet their burden of adequately representing the putative class.

**B.    In This Case, Class Counsel And The Class Representatives Are Not Adequate.**

The Complaint and demand letter are replete with false statements, which was revealed through simple questioning of the plaintiffs.  Counsel failed to attach any exhibits to the complaint, although the complaint purported to rely on those exhibits to demonstrate common representations to the class.  After filing the complaint, counsel's document production, which included documents that the class representatives had never seen, further concealed the falsity of the core allegations of the Complaint.

Having presented a transparently invented story, Plaintiffs' counsel have revealed their inadequacy to serve as class counsel.  And having subscribed to a false story either at the insistence of their counsel or on their own initiative, the named class Plaintiffs have likewise demonstrated their inadequacy to serve as class representatives.

***Plaintiffs' counsel created a false demand letter and complaint***.  The class claims in this case are based on assertions of fact that simple questions to plaintiffs have disproven, and which no amount of additional discovery can salvage.

*Public camping*.  A primary theme in this lawsuit is that the Feskes believed the Thousand Trails campgrounds were exclusive, *i.e.*, that Thousand Trails did not permit the public to use the campgrounds, and that Plaintiffs relied on that representation when they decided to become members.  The Complaint alleged that the Defendants "promised the Feskes that use and enjoyment of certain campgrounds and portions of the other campgrounds would be limited to members and their guests."  Compl. ¶ 14.  It alleged that "[t]his" alleged "promise was material to the Feskes, because it limited overcrowding, meant better access to the facilities and ensured that those persons using the campgrounds would have a long-term interest in maintaining the facilities and abiding by the rules of the campgrounds.  Further[,] this promise resulted in the Feskes believing that in order to use the facilities and amenities at the Defendants' campgrounds, they would have to purchase a membership from defendants — in other words,

1  they understood that they could not merely pay to visit those campgrounds on a per-use basis."

2  *Id.* The Complaint even alleged that "[b]ased on Defendants' representations and promises that"

3  the "use of the campgrounds would be limited to members and their guest, the Feskes purchased

4  a membership in Defendants' campgrounds." Compl. ¶ 15. These allegations were incorporated

5  into every Count in the Complaint, and formed the basis of Plaintiffs' fraud claim. *See* Compl.,

6  Count VIII.

7  The demand letter, which Plaintiffs' counsel wrote, also focused on the exclusivity issue.

8  (Ex. B.) The letter stated "[w]hen we purchased our membership, we were assured that non-

9  members were not permitted to use the amenities at the campgrounds associated with Thousand

10  Trails." The letter explained that "[w]hen we have gone to Thousand Trail campgrounds on the

11  weekends in the past, we have noticed that there are several non-members who are not guests of

12  members exploiting the amenities at the Thousand Trails campgrounds, such that the

13  campgrounds are crowded and cannot be enjoyed by us." *Id.*

14  These allegations are false. Neither Mr. nor Mrs. Feske recalled ever being promised

15  exclusive access to any of the Defendants' campgrounds. For example, David Feske testified:

16  Q:  Did anyone ever promise you that the enjoyment of certain of your campgrounds or portions of other campgrounds would be limited to members and their guests?"

17  A:  Not to my knowledge.

18  Ex. I at 90:22-91:3. He further testified:

19  Q:  When you purchased your membership, were you assured that non-members were not permitted to use the amenities at campgrounds associated with Thousand
20  Trails?

21  A:  I don't remember.

22  *Id.* at 149:2-6. Similarly, Mrs. Feske testified that she "assumed that [Thousand Trails was] a

23  private campground," but when asked whether she "ever discuss[ed] that question with anybody

24  as best [she] recall[ed]," she answered "No." Ex. J at 47:13-48:9. When asked directly about

25  Defendants' written disclosures, she testified:

26  Q:  Do you ever recall reading anything that the company wrote to indicate that the public was not allowed to camp at any of its campgrounds?

27  A:  No.

28

1  Ex. J at 48:10-14; *see also id.* at 24:1-10 (Mrs. Feske did not remember talking to anybody at
2  Thousand Trails or NACO about "whether members of the public could camp at some of the
3  sites," or whether she read "anything on the website about whether members of the public could
4  camp at any of the sites.")

5      The Feskes confessed that statements in the demand letter were false.  Mrs. Feske
6  confirmed that she "didn't have any conversations [her]self with anybody about whether non
7  members could use the amenities at the campground."  Ex. J at 35:21-25.  The Feskes also
8  denied the statement in their letter that they had observed "non-members" crowding the
9  campgrounds and exploiting the facilities.  Indeed, the Feskes testified they had only visited a
10  Thousand Trails campground once the entire time they were members, and that the letter's
11  reference to visiting "Thousand Trails campgrounds on the weekends" thus was false.  Ex. J at
12  36:4-37:11; Ex. I at 149:7-151:23.  Mr. Feske testified that on the one occasion they had camped,
13  the campground was not crowded, and there was no indication that non-members were present.
14  Ex. I at 151:25-152:6.  Mr. Feske further testified that he had not observed non-members who
15  were not guests of members exploiting the amenities at the Thousand Trail campgrounds such
16  that the campgrounds are crowded and cannot be enjoyed by members, which the demand letter
17  had claimed.  *Id.*; *see also* Ex. I at 151:11-23  Similarly, Mrs. Feske testified:

18      Q:    [W]here this letter states that 'We have noticed there are several non members
            who are not guests of the members exploiting the amenities at the Thousand
19            Trails campgrounds,' you did not in fact notice several non members; correct?

20      A:    Correct.

21  Ex. J at 37:3-11.

22      Not only have the Feskes admitted that they were never promised that the campgrounds
23  were exclusive, they only visited a Thousand Trails campground on one occasion, during which
24  they were not troubled by non-member camping.  The allegations about exclusivity do not reflect
25  the Feskes' actual concerns, but are an attempt to create common claims where none exist.

26      *Money-Back Guaranty.*  Another allegation in the Complaint is that Defendants
27  "promised the Feskes that if they were not satisfied with their campground membership, the
28  money they paid for that membership would be refunded."  Compl. ¶¶ 13; 67.  Plaintiffs
   specified that the Defendants made this guaranty through "their website."  *Id.*  Plaintiffs allege

-15-

1  Defendants' representations about the money-back guaranty give rise to a claim for fraud.

2  Compl. ¶ 67.

3       At their depositions, however, the truth emerged — the Feskes were neither promised nor

4  induced to join by a promise of a money-back guaranty.  Mr. Feske testified he did not remember

5  whether anyone told him "that if you were not satisfied with your campground membership, the

6  money you paid for that membership would be refunded." He conceded that if he testified on the

7  topic, "I'd be guessing." Ex. I at 89:15-90:12.  Similarly, Mrs. Feske testified that nobody "at

8  Thousand Trails or NACO ever discuss[ed] with [her] the question of getting [her] money back

9  if [she was] not satisfied with the program." Ex. J at 20:22-21:1.  She further testified that she

10  does not "remember reading anything specifically about a money-back guaranty for" Thousand

11  Trails. Ex. J. at 60:5-11.  Although she believed there was a money-back guaranty based on her

12  "general understanding" of the website (*id.* at 60:5-61:13; 103:13-20), the website was not in

13  existence in 2002 when the Feskes became members.  Accordingly, the Feskes cannot have

14  relied upon any representations on that website in deciding to become members.  Thus, given

15  that Mr. Feske recalls being promised no money-back guaranty at all, and given that Mrs.

16  Feske's understanding that a money back guaranty was available was based solely on a website

17  that was not in existence when the Feskes obtained their membership, the Feskes' allegations

18  that they were induced to purchase a membership by a promise of a money back guaranty is

19  false.

20       ***The Complaint alleged common representations that were not made and counsel***

21  ***produced documents Plaintiffs never possessed***.  Another primary focus of the complaint is that

22  all members, the Feskes included, allegedly received the same or similar misleading or non-

23  compliant disclosure statements and membership agreements.  The Complaint alleged they

24  received standardized new member disclosures, claimed that standardized disclosures were

25  attached as exhibits to the Complaint, and Plaintiffs' counsel later produced documents

26  constituting those disclosures.  However, as the Feskes explained in their depositions, they

27  inherited their membership and never received any new member disclosure statements,

28  standardized or otherwise.

1       Plaintiffs' Complaint is based on the premise that Defendants provide "standardized"

2 agreements, including "membership agreements" and "disclosure statements," to all members.

3 Compl. ¶ 12. All customers who purchased memberships, whether in-person or on the web,

4 allegedly received these documents — including the Feskes. *See id.*; *see also* Compl. ¶ 18

5 ("Defendants presented the material terms of the membership agreement and other documents as

6 standard, non-negotiable terms made available on the same basis to all persons obtaining

7 membership in Defendants' campgrounds."). Plaintiffs purported to incorporate these

8 documents by reference into the Complaint, and state they had attached — but did not actually

9 attach — a copy of the "standardized" disclosure statement and membership agreement to the

10 Complaint. *See* Compl. ¶ 12 ("The membership agreement presented to potential members who

11 identify that they reside in California, for example, [i]s attached hereto as Exhibit A."); Compl.

12 ¶12 ("The Disclosure Statement Agreement presented to potential members who identified that

13 they reside in California, for example, [i]s attached hereto as Exhibit B.").[4] The Complaint

14 asserts that these membership agreements and disclosures violated the campground membership

15 statutes of five states. *See* Counts I-V.

16       Despite the references to the "standardized" documents "all persons" allegedly received

17 (Compl. ¶ 18), the Feskes testimony confirmed that they never received any of those documents

18 because the Feskes inherited their membership from Mr. Feskes' parents. Thus, the only

19 membership agreement the Feskes ever received was an "Asset Transfer Agreement," which

20 they signed when the membership was transferred to Mr. and Mrs. Feske from his mother's

21 estate. *See supra* p. 6-7, Ex. J at 71:2-8 (Mrs. Feske: the Asset Transfer agreement incorporating

22 Mr. Feskes' parents' agreement was "the only agreement that [she] know[s] of that [she] signed

23 related to the campground membership at issue here[.]"); *see also* Ex. I at 210:8-20; 21:17-26:22

24 (Mr. Feske discussed the membership agreement he obtained through the transfer of his mother's

25 assets).

26 _____

27 [4] The Complaint recites that plaintiffs had attached to the Complaint documents reflecting the so-called uniform misrepresentations. The copy served on Defendants, however, as well as the

28 copy filed with the Court, did not contain any exhibits. Plaintiffs never provided the Complaint exhibits until July 7, 2012. Bradford Decl. ¶¶ 5-6.

1    Indeed, both Feskes testified they did not remember seeing, or had not seen, either so-

2  called "standardized" document. *See* Ex. I at 181:22-183:4 (Mr. Feske was unfamiliar with

3  document numbered "Feske 56-60" (the Thousand Trails Disclosure Statement, now identified as

4  the purported "Exhibit B" to the Complaint)); Ex. J at 44:4-17 (Mrs. Feske was unfamiliar with

5  that same document); Ex. I at 178:17-180:14 (Mr. Feske was unfamiliar with document "Feske

6  54-55", the "standardized" California Zone Park Pass membership agreement now identified as

7  the purported "Exhibit A" to the Complaint)); Ex. J at 43:10-44:3 (Mrs. Feske had never seen the

8  standardized membership agreement before, and did not know where it came from); *see also* Ex.

9  I at 224:4-11; 256:6-8; Ex. J at 85:22-86:16 (the Feskes did not recall having seen a "standard"

10  disclosure statement produced by defendants (Ex. O) marked as Ex. 4 in the Feskes'

11  depositions).

12    Despite the fact that the Feskes did not receive standard disclosures, Plaintiffs' counsel

13  included such disclosure forms in the document production produced on Plaintiffs' behalf.  In

14  other words, documents which the Feskes had not received or even seen were somehow included

15  in the production of their own file on the program, mixed together with their Asset Transfer

16  Agreement and their letters and personal documents.  At and after the depositions, Plaintiffs'

17  counsel refused to provide an explanation for the inclusion of these documents in the Feskes'

18  production.[5]

19    In a final bid to create commonality where none exists,  Plaintiffs' counsel peppered the

20  Complaint and the demand letter with references to the Defendants' website and "Zone"

21  camping program.  The Complaint alleges the Feskes were deceived by the Thousand Trails

22  website, which they reference throughout the Complaint.  For example, the Complaint alleges

23  that "Defendants continue to make and permit false and deceptive statements to be made on their

24  ───────────────

[5] Defendants are entitled to know what documents came from plaintiffs, and what documents
25  were added by counsel.  Rule 26(b)(1) ("[p]arties may obtain discovery regarding *any*
nonprivileged matter that is relevant to any party's claim or defense . . . including the existence,
26  description, *nature, custody,* condition, *and location* of any documents). *See Trzeciak v. Apple
Computers, Inc.*, 1995 WL 20329, at *7 (S.D.N.Y. 1995) (granting motion to compel
27  identification of "custodian of" records, "the production of which is sought in document
requests," and noting "[w]e have ordered production of those records, and in any event can
28  imagine no basis for refusing to identify their custodian.").

website (www.thousandtrails.com) including "statements implying that Thousand Trails campgrounds are 'exclusive' or open to only 'lifetime members and purchasers of the Zone Camping Pass'; that only a small subset of the Thousand Trails campgrounds were available for use by non-members; and that memberships in Thousand Trails included a 'Money Back Guarantee.'" Compl. ¶ 21. They further allege that the "Feskes and other similarly situated members have suffered injury in fact and have lost money or property . . . based on false or deceptive representations and assurances provided in the website." Compl. ¶ 22; *see also* ¶ 27 ("Plaintiffs are members of the class they seek to represent" and "were presented with the same advertisements and representations upon visiting Defendants' website as were all other Class Members").

The demand letter Plaintiffs' counsel drafted complained that they were not permitted to use a Las Vegas campground that was in the Southwest Zone of the "Zone Park Pass Program." *See* Ex. B ("Last year when we tried to make a reservation at the campground in Las Vegas, which we understand to be part of the southwest zone, we were told our membership does not include that campground.") The complaint also referenced the "zone" camping program, alleging that Defendants stated Thousand Trails campgrounds were open only to "lifetime members and purchasers of the Zone Camping Pass." In their document production, Plaintiffs' counsel produced on Plaintiff's behalf documents relating to the Zone camping program, including advertisements inviting customers to "Experience Thousand Trails with the Zone Camping Pass!" or to purchase a zone camping pass; (Ex. F at 1, 6-7); and the Zone Park Pass Usage Rules (Ex. G).

Plaintiffs' document production also included documents relating to these allegations, although the produced documents did not originate with the Feskes. Counsel produced on the Feskes' behalf pages from the website, including various pages that featured information about reservations, news, discounts and other information. *See* Ex. F. In their depositions, the Feskes admitted that they never relied on any representations from the website, and further that they had not seen before preparing for their deposition webpage printouts that were included in their production. *See, e.g.*, Ex. I at 191:25-192:4; Ex. J. at 45:3-10 (when asked if he had seen

1   documents produced as Feske 62-63, (Ex. F at 2-3), Mr. Feske testified "I don't think so"; when

2   asked the same question, Mrs. Feske said "No"); *see also* Ex. I at 195:1-6; Ex. J. at 48:18-49:8

3   (when asked if he had seen documents produced as Feske 66-73 (Ex. F. at 6-13), Mr. Feske said

4   he had never seen those pages before; when asked the same question, Mrs. Feske said she did not

5   recall seeing them and did not know where they came from).  Accordingly, the allegations about

6   the website, like so many of the other allegations, appear to have been invented and supported by

7   documents Plaintiffs' counsel slipped into the production as if they had been in the Feskes'

8   possession.

9

10                              *     *     *     *     *

11          Counsel has demonstrated either a lack of integrity or a lack of diligence, in pursuing a

12   class claim in this case.  Either their misconduct involves participating in fabricating statements

13   on behalf of the putative class plaintiffs, or their pre-filing investigation was grossly insufficient.

14   Under these circumstances, Plaintiffs' counsel are totally inadequate to serve as class counsel.

15   As the Central District admonished in *Evans*, "[i]n class actions especially, it is critical that the

16   Court be able to rely on the accuracy of evidentiary submissions obviously and necessarily

17   drafted by counsel." *Evans*, 244 F.R.D. at 579.  In *Evans*, the court denied a motion for class

18   certification where, among other things, "Plaintiffs' counsel . . . included statements in Plaintiffs'

19   declarations that were either admittedly false, that were simply made up by the declarant, or for

20   which the declarants lacked actual knowledge." *Id.* at 578.

21          The proposed class representatives fare no better.  It is also apparent that the Feskes, the

22   class representatives, signed a false demand letter and permitted the filing of a false complaint.

23   Here, as in *Byes*, given the Feskes' admittedly "limited understanding about these proceedings,"

24   it is entirely likely that they signed their demand letter and agreed to the Complaint "at the behest

25   of [their] attorneys without understanding the significance of doing so."  173 F.R.D. at 427.

26   These false documents indicate that the Feskes place "blind reliance" on their attorneys, "but

27   even more so, it reflects poorly on the adequacy of" the Feskes' counsel. *Id.*  Thus, as in *Evans*,

28   counsel's "lax approach to the preparation" of the documents in a case "where they seek to

-20-

1  represent hundreds of thousands of people . . . is simply unacceptable." *Evans*, 244 F.R.D. at

2  578-580.[6]  But, if the false statements were the fault of the Feskes, rather than counsel, the result

3  would be the same.

4      Plaintiffs and their counsel have proven they cannot serve as fiduciaries.  In these

5  circumstances, class certification must be denied.

6  **III.**   **Class Certification Should Be Denied Because The Plaintiffs Concede Their Claims**
       **Are Not Typical Of The Claims Of The Class And Plaintiffs Cannot Adequately**
7     **Represent the Class.**

8      The class representative must adequately represent the interests of the class.  Class

9  representatives must be honest servants of the class, and must show they will faithfully represent

10  the interests of their class.  *Red v. Kraft Foods, Inc.*, No. 10-1028, 2011 WL 4599833, at *13

11  (C.D. Cal. September 29, 2011) (noting "Defendants have raised several doubts about Plaintiffs'

12  ability to fairly and adequately represent the class") (quoting *Wal-Mart v. Dukes*, 180 L. Ed. 2d

13  374, 390 n.5)); *Beck v. Status Game Corp.*, 1995 U.S Lexis 9978 (S.D.N.Y. July 13, 1995)

14  ―――――――――――――――

15  [6] Counsel's conduct during the deposition — in which counsel refused to identify the plaintiffs' production and at one point even answered a question for the witness — underscores counsel's
16  inadequacy. *See* Ex. I at 196:24-200:17 (refusing to identify production); *id.* at 235:24-236:3 (when Mr. Feske was asked what he would like the Defendants to do to remedy their alleged
17  misconduct, Mr. Shenkman interposed: "How about follow the law."); *Ballan*, 159 F.R.D. at 490 (denying class certification where, *inter alia*, at the plaintiff's deposition his "attorney
18  interrupted with a statement or an attempt to coach the witness" and otherwise engaged in "improper and disruptive" conduct); *Wrighten v. Metropolitan Hosps. Inc.*, 726 F.2d 1346, 1351-
19  52 (9th Cir. 1984) (affirming denial of class certification where, *inter alia,* counsel "disrupted depositions with inappropriate comments").  Counsel's conduct ranged from disruptive
20  comments to instructing the witness not to answer questions that elicited discoverable information. *See, e.g.*, Ex. J at 92:23-93:4 (When Mrs. Feske was asked whether she or Mr.
21  Feske were responsible for the costs of this suit, Mr. Shenkman invoked attorney-client privilege); *see* Ex. I at 234:9-19 (when Mr. Feske was asked about his ability to pay fees for
22  which he may ultimately be responsible, Mr. Shenkman invoked the "privacy privilege embodied in the California Constitution").  Of course, a class representative's knowledge of, and ability to
23  bear, fees and costs of litigation is not privileged and is relevant to gauging that plaintiff's adequacy.  *Stanley v. Bayer Healthcare LLC*, 2011 WL 5569761, at *3-4  (S.D. Cal. 2011)
24  ("retainer agreements are not protected by the attorney-client privilege or work product doctrine); *Armour v. Network Assoc., Inc.*, 171 F. Supp. 2d 1044, 1048-49 (N.D. Cal. 2001) ("in
25  order to determine whether a prospective lead plaintiff satisfies the requirements of Rule 23 . . . a court should consider the manner in which the prospective lead plaintiff retained counsel and
26  negotiated an attorney's fee for the class."); *In re Quintus Sec. Litig.*, 148 F. Supp. 2d 967, 972 (N.D. Cal. 2001) ("[B]oth lead plaintiff and lead counsel have an obligation to enter into a fair
27  fee arrangement. It is the court's independent obligation under F.R.C.P. 23 to ensure that this occurs").

28

1   (quoting 7A Wright & Miller § 1766 (2d Ed. 1986)) (plaintiffs may not "simply lend[] their

2   name to a suit controlled entirely by the class attorney"). Plaintiffs are inadequate where they

3   show "a lack of credibility regarding the allegations being made, or a lack of knowledge or

4   understanding concerning what the suit is about." *Kelley v. Mid-Am. Racing Stables, Inc.*, 139

5   F.R.D. 405, 409-10 (W.D. Okla. 1990).

6         The Complaint alleges that the Feskes possess claims in common with other members of

7   the class they seek to represent. It also alleges that they relied on representations made to the

8   class in common, and even purported to attach those common disclosures to their Complaint.

9   The Complaint likewise alleges the Feskes were victims of misstatements regarding public

10  camping, that they were denied a money-back guaranty, and were deceived by the website. Not

11  only are these alleged complaints not common to all members of the class, but even the Feskes

12  themselves have now conceded they had no such complaints. The named plaintiffs thus lack

13  claims typical of the putative class.

14        ***Common representations***. The Complaint alleges the Feskes received common, written

15  representations, but attached nothing. Compl. ¶ 12. The Complaint went so far as to claim to

16  have attached the written representations. But as discussed (*supra* pp. 6-7, 13), the Feskes' own

17  sworn testimony makes clear that they did not receive or rely on any common representations.

18  *See, e.g.*, Exs. A, C, H (documents showing transfer of membership to the Feskes); *see also* Ex. I

19  at 21:17-26:14 (D. Feske discussing his decision to keep his mother's "membership . . . going"

20  after she passed away); *id.* at 181:22-183:4, Ex. J. at 44:4-17 (the Feskes did not recall receiving

21  "form" disclosure statements they produced); Ex. I at 224:4-11; 256:6-8; Ex. J at 85:22-86:16

22  (the Feskes did not recall receiving "form" disclosure statement produced by defendants (Ex. O)

23  marked as Ex. 4 in the Feskes' depositions); Ex. I at 178:15-181:21; Ex. J. at 43:10-44:3 (the

24  Feskes did not recall receiving the "form" Zone Park Pass membership agreement). Thus, unlike

25  new members who purchase from the Company, the Feskes never received a membership

26  agreement or a Disclosure Statement. *Id.*; *see also* Ex. I at 85:24-87:11 (Mr. Feske stated that

27  the membership agreement he signed was different from the agreement that did not have his

28  signature); Ex. J at 70:19-71:8 (Mrs. Feske stated the only membership agreement she signed

-22-

1    was the transfer agreement (Ex. A) that gave them ownership of Mr. Feske's mother's

2    membership). They inherited their membership from Mr. Feske's mother. They do not have a

3    claim in common with the class regarding Defendants' representations.

4          ***Public camping***. The Complaint alleges the Feskes were injured by the availability of

5    public camping. *E.g.* Compl. ¶¶ 14, 22. By the Feskes' own sworn testimony, they have never

6    even noticed public campers at the campsites. *E.g.* Ex. I at 149:7-151:23; 151:25-152:6; Ex. J.

7    at 36:4-37:11. They certainly have no claim regarding public camping. *Id.*; *see also* Ex. I at

8    90:22-91:3;149:2-6; Ex. J. at 47:18-48:14; 24:1-10; 35:14-36:3.

9          ***Money-back guaranty***. The Complaint alleges the Feskes were deprived of a money-

10   back guaranty. Compl. ¶ 13. By the Feskes' own sworn testimony, they could not recall being

11   promised a money-back guaranty, and the only reason they believed there was a money-back

12   guarantee was from Mrs. Feske's "general understanding" of a website that was not even in

13   existence in 2002 when the Feskes obtained their membership. *E.g,* Ex. I at 89:25:-90:12; Ex. J

14   at 20:22-21:1; 21:2-5; 60:5-61:13; 103:13-20.   Because they were not induced to purchase a

15   membership by the promise of a money-back guaranty, the Feskes certainly have no claim

16   regarding that purported guaranty. *Id.*

17         ***Website statements***. The Complaint alleges the Feskes were deceived by statements on

18   the Thousand Trails website. Compl. ¶¶ 21-22. By the Feskes' own sworn testimony they did

19   not rely on the website in obtaining or keeping their membership. Rather, they inherited the

20   membership, and thus could not have relied on any of the disclosures or membership information

21   on the website. In fact, Mr. Feske has never even visited the website (Ex. I at 65:14-66:10), and

22   Mrs. Feske could not recall anything specific about the website that would have convinced her to

23   remain a member. Ex. J. at 104:6-105:5. Regardless of whether other putative class members

24   may complain about it, the Feskes certainly have no claim regarding statements on the Thousand

25   Trails website.

26         Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of

27   the claims or defenses of the class." The typicality requirement "ensure[s] that only those

28   plaintiffs . . . who can advance the same factual and legal arguments may be grouped together as

1    a class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998).

2    To satisfy typicality, a class representative must "possess the same interest and suffer the same

3    injury as the class members," *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982), such that the

4    evidence needed to prove the named plaintiff's claim also proves the other class members'

5    claims. *Wiener v. Dannon Co.*, 255 F.R.D. 658, 665-66 (C.D. Cal. 2009).

6           Plaintiffs' claims are not typical for two primary reasons. First, plaintiffs and the

7    proposed class members do not "advance the same factual and legal arguments" because the

8    Feskes are in a different position than the alleged other putative class members. As shown

9    above, the Feskes can identify no way in which their claims are typical of the claims of any other

10   members. The Feskes cannot even identify any specific representations upon which they relied.

11   No amount of further discovery can give the Feskes claims that are typical of any other alleged

12   putative members of the class. They have already conceded they have no such claims.

13          Second, the Feskes must "possess the same interest and suffer the same injury" as other

14   alleged putative class members. *Falcon*, 457 U.S. at 156. The Feskes seek rescission, but they

15   are no longer members, and thus have a very different interest than existing members. They

16   make no showing or even any allegation that other members would prefer to rescind their

17   memberships. Additionally, the Feskes' complaint that they were injured because they could not

18   use the Las Vegas campground is unique. They were not even entitled under their program to

19   access the Las Vegas campground. *See, e.g.*, *Heisler v. Maxtor Corp.*, No. 06-6634, 2010 WL

20   4788207, at *5 (N.D. Cal. Nov. 17, 2010) (plaintiffs atypical if they did not suffer a "cognizable

21   injury, let alone an injury that is common to the class").

22                                          **CONCLUSION**

23          For the reasons set forth above, Defendants respectfully request that the Court deny class

24   certification.

25                                   Respectfully submitted,

26                                   MHC THOUSAND TRAILS LIMITED
                                     PARTNERSHIP, MHC OPERATING LIMITED
27                                   PARTNERSHIP, EQUITY LIFESTYLE
                                     PROPERTIES, INC., a Maryland corporation;
28

-24-

1

2

THOUSAND TRAILS MANAGEMENT
SERVICES, INC., a Nevada corporation,

3

By____ /s/  David J. Bradford_____
                One of Their Attorneys

4  Dated:  July 23, 2012

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 11-04124 (PSG)                                    Motion to Deny Class Certification